[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-13709
Non-Argument Calendar
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 22, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00201-CV-M-N

E. MICHELLE WORTHINGTON,
on behalf of minor child, JW,

Plaintiff-Appellant,

versus

ELMORE COUNTY BOARD OF EDUCATION,
MARSHALL ANDERSON, Assistant
Superintendent of Education,
sued individually,
PAT ELLIS, Administrator of
the intensive Therapeutic
Placement Center, sued individually,
HENRY BLAKE, individually,

Defendants-Appellees,

BRUCE FULMER, Superintendant
of Education, sued in his
official capacity,
CAROL MCGALLIARD, Assistant
Superintendent of Education, sued
individually and in her official
capacity, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

**(December 22, 2005)**

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Michelle Worthington, on behalf of her minor child J.W., filed this 42
U.S.C. § 1983 suit against the Elmore County Board of Education (the "Board")
and various individual defendants, alleging that her son's constitutional rights were
violated when he was sexually assaulted by another student on his special
education school bus. Worthington also asserted a state law negligence claim
against the bus driver, Henry Blake. The magistrate judge held a jury trial but, at
the close of Worthington's case, granted judgment as a matter of law in favor of
the Board and Blake.[1] On appeal, Worthington challenges the grant of judgment as
a matter of law only as to her § 1983 claim against the Board and her negligence
claim against Blake. After review, we affirm.

## I. BACKGROUND

At the time of the incident, October 3, 2002, J.W. was seven years old and

---

[1]The parties consented to the jurisdiction of a magistrate judge.

was enrolled in the Intensive Therapeutic Placement Center ("ITPC") in the Elmore County School System. According to the parties' joint stipulation of facts, ITPC is "an alternative school for students with behavioral and emotional problems." While enrolled at ITPC in the fall of 2002, J.W. regularly rode a small, special education bus, with five seats and spaces for wheelchairs, to and from school. This bus transportation was provided by the Board.

J.W.'s bus ride to school each day was about thirty miles, and there was a specific authorized location at which the bus driver was to pick J.W. up in the morning and drop him off in the afternoon.

On October 3, 2002, J.W.'s regular bus driver was absent, and Henry Blake, a substitute bus driver for the Elmore County School System, was called in to drive the bus. J.W. alleges that he was sexually molested and assaulted on the bus that afternoon by J.M., another student who was eleven years old at the time. According to J.W., J.M. offered J.W. candy if he came and sat next to J.M. in the bus seat. J.M. then pulled out his penis, shook it, and convinced J.W. to shake it and to put his mouth around it. J.M. then turned J.W. around, pulled his pants down, and attempted to penetrate J.W.'s anus. When J.W. complained that it hurt, J.M. turned J.W. around and again convinced him to shake J.M.'s penis until he

3

ejaculated.[2]

That afternoon, Henry Blake let J.W. off at a stop other than his authorized stop. J.W. was picked up by another bus driver, who found J.W. walking along the highway more than a mile from home and took J.W. home. J.W. told his mother of the alleged events, and Worthington contacted the Elmore County Sheriff's Department. J.W. was taken to the hospital to be examined and also gave a statement to Elmore County Sheriff's Deputy R.G. Head.

The next day, Worthington and J.W. met with Elmore County Chief Investigator G.W. Kracke. At the conclusion of that meeting, they all were called to the school, where they met ITPC Administrator Pat Ellis. Investigator Kracke, school counselor Les Schlensker, and Associate Superintendant Marshall Anderson met with J.M. and his guardian. According to Kracke's trial testimony, "[i]t was very difficult to talk with [J.M.]. But based on what I was interpreting him saying, that he was admitting to a sexual act on the bus." Schlensker, however, testified that J.M. denied any physical contact. Anderson also testified that J.M. denied physical contact but admitted that the two boys had exposed themselves to each other.

After the incident, J.W. and J.M. continued to attend ITPC but were taught

---

[2]The defendants dispute that these events occurred and point to evidence that J.M. denied any physical contact.

4

in separate classrooms. They both rode the bus from the ITPC to the cafeteria at Wetumpka High School for lunch, but were seated with their own classes and supervised at all times. No problems are alleged to have arisen on these trips. In December 2002, Worthington removed J.W. from ITPC and the Elmore County School System, and J.W. began attending school in the Jemison School System.

On March 4, 2004, Worthington filed this action in the district court. As amended, Worthington's complaint asserted claims against the Board and a variety of individual defendants for violations of the Fourteenth Amendment, Title IX, and state law. Specifically, Worthington's claims relevant to this appeal were (1) that her son's Fourteenth Amendment right to bodily integrity and to be free from sexual assault was violated as a result of the Board's policies, and (2) that Blake negligently supervised her son and J.M. on the bus, leading to the assault.

At trial, after Worthington rested, the defendants moved for judgment as a matter of law. The magistrate judge granted the motion as to the Fourteenth Amendment claim against the Board, concluding that the assault did not result from a Board policy. The magistrate judge further granted judgment as a matter of law in favor of Henry Blake as to the negligence claim against him on the ground that he was performing a discretionary function and thus enjoyed sovereign

immunity.[3]

On appeal, Worthington argues that the magistrate judge erred in granting judgment as a matter of law in favor of the Board as to the Fourteenth Amendment claim and in favor of Blake as to the state law negligence claim.

## II. STANDARD OF REVIEW

In reviewing a grant of judgment as a matter of law, this Court applies the same standard as the district court or magistrate judge. Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272, 1278 (11th Cir. 2005). Judgment as a matter of law should be granted "when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." Id. (citation omitted).

## III. DISCUSSION

## A. Fourteenth Amendment Claim Against the Board

Worthington first argues that the magistrate judge erred in granting judgment in favor of the Board on her Fourteenth Amendment Claim, brought pursuant to § 1983. Specifically, Worthington argues that J.W. was assaulted as a result of the Board's policy of having only one adult, the bus driver, supervise

---

[3]The magistrate judge denied judgment as a matter of law at that time on certain claims against one defendant, but then granted judgment of a matter of law in favor of that remaining defendant at the close of the defense case.

6

ITPC students on the bus, notwithstanding that the students needed constant adult supervision.

Municipal entities, such as the Board, cannot be held liable on a theory of respondeat superior. Sauls v. Pierce County Sch. Dist., 399 F.3d 1279, 1287 (11th Cir. 2005). Rather, to impose liability on a municipal government under § 1983, "the plaintiff must identify a municipal 'policy' or 'custom' causing the deprivation of federal rights." Id. (citation omitted). As the Supreme Court has explained,

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

Bd. of Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403-04, 117 S. Ct. 1382, 1388 (1997) (internal citations omitted). Further, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." Id. at 404, 117 S. Ct. at 1388. Instead, the plaintiff must also demonstrate that the municipality's "deliberate conduct" was the "moving force" behind the injury alleged. Id. "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link

7

between the municipal action and the deprivation of federal rights." Id. As this Court has previously explained, a plaintiff must show that the municipal action was taken with "'deliberate indifference' to its known or obvious consequences." Davis v. Dekalb County Sch. Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2000) (internal quotation marks and citation omitted) (emphasis added).

We note at the outset that the Board could be liable only if it owed some duty to protect J.W. from third-party assaults. See Wyke v. Polk County Sch. Bd., 129 F.3d 560, 568-69 (11th Cir. 1997). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney v. Winnebago County Dep't. of Soc. Servs., 489 U.S. 189, 195, 109 S. Ct. 998, 1003 (1989). Rather, "[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimum levels of safety and security," and only "in certain limited circumstances [does] the Constitution impose[] upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 195, 198, 109 S. Ct. at 1003, 1004. Those circumstances exist where the State acts to restrain an individual's personal liberty and ability to self-protect, such as where the individual is incarcerated or institutionalized. Id. at 198-200, 109 S. Ct. at 1004-05.

This Court has previously explained that public schools generally do not have the requisite level of control over children to give rise to a constitutional duty to protect them from third-party actors. See Wyke, 129 F.3d at 569; see also Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654, 115 S. Ct. 2386, 2392 (1995) ("[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect . . . .'") (citations omitted). "By mandating school attendance, the state simply does not restrict a student's liberty in the same sense that it does when it incarcerates prisoners or when it commits mental patients involuntarily." Wyke, 129 F.3d at 569. Nevertheless, Worthington argues that J.W. was in a "special relationship" to the State because he was forced to attend a special school for children with learning disabilities and behavioral problems, forced to ride the bus, and suffered from known mental, emotional, and behavioral disabilities making him dependent on the Board for safety. We do not believe that these factors created a special relationship or a duty on the part of the Board to protect J.W. from third parties.[4]

---

[4]On this issue, Worthington relies primarily on Teague v. Tex. City Indep. Sch. Dist., 348 F.Supp. 2d 785 (S.D. Tex. 2004), in which the district court denied a motion to dismiss a § 1983 claim relating to an incident in which a student with Down's Syndrome allegedly was sexually assaulted by another student in the school restroom. However, the district court in Teague subsequently vacated its prior order in part and granted the school board's motion for summary judgment, concluding that no special relationship existed between the school board and the special education student to create a duty on the part of the board to protect the student from the alleged incident. Teague v. Tex. City Indep. Sch. Dist., 386 F.Supp. 2d 893, 896 (S.D. Tex. 2005).

Thus, even if the Board acted with deliberate indifference, there was no constitutional violation.

Even assuming the Board was obligated to protect J.W., the magistrate judge nevertheless properly determined that the Board was not deliberately indifferent to J.W.'s constitutional rights. Worthington alleges that the Board had a policy of transporting troubled ITPC students with no supervision other than the bus driver. She asserts that the Board's policy was to place aides, in addition to the bus driver, on buses only when students with physical disabilities were on board. Thus, ITPC students such as J.W. and J.M. were under the sole supervision of the bus driver. Worthington argues that the ITPC students exhibited emotional and behavioral problems, and specifically that J.M.'s individualized education plan ("IEP") noted that he was sneaky, aggressive, made inappropriate comments to female students, and needed to be supervised at all times. As a result, Worthington argues that by transporting the ITPC students on the bus with only the supervision of the bus driver, whose main focus was on driving rather than supervising the conduct of the students, the Board placed ITPC students such as J.W. in a vulnerable position and failed to protect them from foreseeable harm inflicted by other students. She argues that the Board was aware of the need for a second adult to supervise the troubled ITPC students, as evidenced by the ITPC policy that each classroom must

10

have an aide as well as a teacher present at all times to monitor the students during class when the teacher is working with an individual student or when the teacher must leave the room.[5]

Worthington's argument is not persuasive. First, despite Worthington's contentions, the evidence at trial was that the determination of whether to place an aide on the bus was made not by the Board, but by the IEP committee; that an aide could have been placed on the bus if any of the students' IEPs so recommended; and that an aide could be requested in any student's IEP, not just a physically disabled student's IEP. In addition, there was no evidence to establish a custom of failing to provide aides when recommended by IEPs. There was no aide on board J.W.'s bus because none of the students' IEPs so recommended, not because a Board policy precluded the supervision of an aide.

In any event, even if the Board did have a policy of transporting ITPC students under the sole supervision of the bus driver, Worthington has failed to show that such a policy was a "moving force" behind the alleged assault. The alleged assault was committed by another student on the bus, and not an actor of the school district. There is no evidence that J.W. sought the help of the bus driver or otherwise did anything to get the attention of the bus driver. Further, while the

---

[5]It is worth noting that this policy was an ITPC policy and not a Board policy.

11

Board perhaps could have implemented policies that might have protected J.W. from the assault, such as placing additional supervisors on the bus, the alleged assault certainly was not a "known or obvious consequence" of the failure to take such action. See Davis, 233 F.3d at 1375-76. While J.M. was known to exhibit certain behavioral problems, Worthington points to no evidence that J.M. had previously committed a sexual assault or was a known threat to do so. Nor is ITPC's policy of placing an aide in each classroom relevant to this case. Although it may be ideal to place a second adult in the classroom to facilitate the learning process, that policy in no way suggests that students would be in grave danger if supervised by only one adult on the bus to and from school.

Worthington also argues that the Board failed to require bus drivers such as Henry Blake to be trained about the proper care for special education students. This argument also is unavailing. First, the evidence at trial indicated that bus drivers did receive training on dealing with special education students. In any event, Worthington has failed to show a causal connection between any failure to train bus drivers and the alleged assault.

The alleged assault (if it occurred) is unfortunate, and Worthington's outrage at her son's abuse is certainly justified. However, when the alleged abuse occurred, her son was under the supervision of the bus driver. While that

12

supervision allegedly ultimately failed to prevent the harm, neither the fallibility of the supervisor nor the failure to provide a second supervisor amounts to deliberate indifference. As this Court has previously explained, "a school board is not deliberately indifferent simply because the measures it takes are ultimately ineffective . . . ." Sauls, 399 F.3d at 1285 (citing Davis, 233 F.3d at 1375) (other citation omitted). Thus, the magistrate judge properly determined that no Board policy was the moving force behind the alleged assault.

**B. Negligence Claim Against Blake**

Worthington next claims that the magistrate judge erred in granting judgment as a matter of law in favor of Blake on her negligence claim. The magistrate judge concluded that Blake was entitled to state-agent immunity under Alabama law. We agree.

Pursuant to Article I, § 14 of the Alabama Constitution, "the State of Alabama shall never be made a defendant in any court of law or equity." The Alabama Supreme Court has extended this sovereign immunity to municipal boards of education, as local agencies of the state, and to a person who acts as an agent of such a board if the act was committed while that person was performing certain types of duties that are "discretionary" or require the exercise of judgment. See Carroll v. Hammett, 744 So. 2d 906, 910-11 (Ala. 1999) (stating that "a person

13

who acts as an agent of a county board of education shares in the State's sovereign immunity if the act complained of was committed while that person was performing a discretionary act" and defining a "discretionary" act as one that "requires exercise in judgment and choice and involves what is just and proper under the circumstances") (internal quotation marks and citations omitted).

Historically, the Alabama Supreme Court has held repeatedly that the supervision of students is an act involving discretion and judgment, and that persons engaged in such supervision are entitled to immunity from negligence suits. See, e.g., Carroll, 744 So. 2d at 911 ("It is well established that the supervision of students is a discretionary function.") (citations omitted); Kroger v. Davis, 622 So. 2d 303, 304 (Ala. 1993) ("In supervising the students during recess, the defendant teachers were performing a discretionary function and are therefore immune from liability.") (citation omitted); Coyle v. Harper, 622 So. 2d 302, 303 (Ala. 1993) (holding that teacher who was monitoring the halls when student was injured in her classroom was performing a discretionary function and therefore entitled to immunity).

In 2000, the Alabama Supreme Court restated the rule of state-agent immunity, establishing that the agent is entitled to immunity when the claim is based on certain categories of duties, including where the agent is "exercising

14

judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or <u>educating students</u>." <u>Ex parte Cranman</u>, 792 So. 2d 392, 405 (Ala. 2000) (emphasis added). The Alabama Supreme Court has since granted immunity not only to teachers in school, but also to persons supervising other school-related activities.

For example, in 2003, the Alabama Supreme Court granted immunity to a high school baseball coach where a student alleged the coach was negligent in allowing players to stand without helmets in an area where they could be hit by batted balls. <u>Ex parte Nall</u>, 879 So. 2d 541, 545-46 (Ala. 2003). The Alabama Supreme Court stated that "it is undisputed that [the coaches], in conducting the baseball practice session, were discharging their duties in educating students." <u>Id.</u> at 545. In addition, in <u>Ex parte Blankenship</u>, 806 So. 2d 1186, 1186-90 (Ala. 2000), the Alabama Supreme Court granted state-agent immunity to a band director and school principal in a suit by a minor band member's mother alleging that the defendants negligently supervised her daughter by allowing her to leave after an out-of-town band trip with her older boyfriend, resulting in her statutory rape. Neither the minor nor the boyfriend was a student at the high school, yet the band director's supervision of the minor was deemed to fall within the exception for exercising discretion in educating students. <u>Id.</u> at 1190.

Here, Worthington's claim against Henry Blake arises out of his conduct in supervising the ITPC students while driving them to their bus stops. His performance of that task involved the exercise of judgment in supervising public-education students while driving the bus.[6] Thus, Blake was "exercising judgment in the discharge of duties imposed by statute, rule, or regulation in . . . <u>educating students</u>" and is entitled to immunity under Alabama law. <u>Ex parte Cranman</u>, 792 So. 2d at 405 (emphasis added).

We acknowledge that in <u>Horton v. Briley</u>, 792 So. 2d 432, 434 (Ala. Ct. Apps., 2001), the Alabama Court of Appeals applied <u>Cranman</u> and concluded that a bus driver was not entitled to state-agent immunity with respect to a claim based on a vehicular accident. In that context, the Court of Appeals noted that "characterizing as a discretionary function conduct remote from the execution of governmental policy would perpetuate an erroneous construction of the Constitution." <u>Id.</u> (quoting <u>Cranman</u>, 792 So. 2d at 404) (brackets and ellipsis omitted). However, <u>Horton</u> is inapplicable here because the conduct at issue is

[6]Worthington argues that Blake's supervision was ministerial and not discretionary, relying on one 1982 Alabama Supreme Court case, <u>DeStafney v. Univ. of Ala.</u>, 413 So. 2d 391 (Ala. 1981), in which the court denied immunity to a daycare worker who was supervising a toddler when the toddler was injured. However, in that case, the day care worker was not simply supervising the child; she had actively placed the child on the equipment from which the child fell, incurring injuries. In any event, as described above, the great weight of authority establishes that the supervision of children involves the exercise of discretion and judgment. Thus, we reject this argument.

16

entirely different. Here, the conduct at issue is not the driving of schoolchildren but the supervision of students in the public education system. While the driving of schoolchildren may be "remote from the execution of governmental policy," Alabama Supreme Court precedent clearly indicates that the supervision of children in the public education system is exactly the sort of conduct protected by state-agent immunity.[7] Thus, Horton does not affect Blake's entitlement to state-agent immunity as this case does not involve a vehicular accident.

In any event, even if the Alabama Supreme Court were to decide that the supervision of students by bus drivers is not protected by state-agent immunity, Worthington has pointed to no evidence that Blake was negligent. As discussed previously, there is no indication that either student did anything to get Blake's attention, and he was driving the bus at the same time he was supervising them. Further, as discussed previously, Worthington points to no evidence that J.M. had previously committed a sexual assault or was a known threat to do so, much less that Blake, a substitute bus driver, was aware or should have been aware that J.M. posed such a risk. Assuming the alleged incident occurred, the mere fact that J.W. was assaulted while Blake was driving the bus does not establish that Blake was

---

[7]We note that in Ex parte McWhorter, 880 So. 2d 1116, 1117 (Ala. 2003), the Alabama Supreme Court did grant state-agent immunity to a deputy for a vehicular accident that occurred when he was on duty.

17

negligent in supervising the students.  Thus, the magistrate judge did not err in granting judgment as a matter of law in favor of Blake.

## IV. CONCLUSION

For the foregoing reasons, the magistrate judge's grant of judgment as a matter of law in favor of the defendants is affirmed.

**AFFIRMED.**