967 So.2d 259 (2007)
John S. KAZANJIAN, as Personal Representative of the Estate of Kaitlin Ashley Kazanjian, deceased, Appellant,
v.
SCHOOL BOARD OF PALM BEACH COUNTY, Carlos Pozo and Jorge Fernando Pozo, Appellees.
No. 4D05-4371.
District Court of Appeal of Florida, Fourth District.
September 19, 2007.
Rehearing Denied November 2, 2007.
*261 Judy F. Hyman of Robert M. Montgomery, Jr. & Associates, P.L., West Palm Beach, for appellant.
Mark Hendricks and Elizabeth L. Pedersen of Panza, Maurer & Maynard, P.A., Fort Lauderdale, for appellee School Board of Palm Beach County.
TAYLOR, J.
John S. Kazanjian, as personal representative of the estate of Kaitlin Ashley Kazanjian, appeals an adverse summary judgment on his negligence claims against the School Board of Palm Beach County. This case involves the tragic death of a Dwyer High School student in a car crash that occurred after she left campus without authorization. Kazanjian claims that his daughter and the driver in the fatal crash were habitually truant and that the School Board failed to follow habitual truancy policies, which might have prevented the accident. He also argues that the School Board owed a duty to prevent high school students from leaving campus without authorization.
We affirm the summary judgment, holding (1) the students were not habitually truant, as a matter of law; (2) in the context of a negligence action seeking damages for injuries sustained in a car crash away from school grounds, the School Board owed no duty to lessen the risk of such injuries by preventing high school students from leaving campus without authorization; and (3) in any event, the decision as to the appropriate campus security measures was a policy decision as to which the School Board enjoys sovereign immunity.
In November 2003, after their first-period class, eleventh-graders Courtney Lawrensen, Kaitlin Kazanjian, Carlos Pozo, Danny Shaw, and Chris Roon decided to skip school and go get breakfast. The students had no passes. They simply walked to their cars and left school grounds without being stopped. Kaitlin and Lawrensen left in Lawrensen's car. They all met up at a Mobil station and Kaitlin got into Pozo's car. They were planning to stop at Pozo's house to get money and then drive on to the restaurant.
On the way to his house, Pozo was driving between 72 and 74 m.p.h. on wet roads in a residential area with a speed limit of 35 m.p.h. While fiddling with the radio, *262 Pozo failed to navigate a curve in the road. He crashed his car into two trees, killing Kaitlin. The traffic homicide investigator, Officer Jeffery Main, described the accident as "horrific," indicating that it had a larger debris field than any accident he had investigated in eighteen years.
Dwyer High School has 1,900 students in eight buildings on a 60-acre campus. The school has two police officers and one police aide. There is a fence around the campus with many entrances and exits. There are parking gate restrictions as to when students can come and go. A police aide monitors the parking area and staff members monitor the front gate of the campus. During the day, the gates leading to the athletic fields are open because ingress and egress is necessary to the fields.
The school is not a fortress; gates are open and it is possible to get out. Students are permitted to leave campus during the school day with prior permission of a parent. If a parent sends a note that the student has permission to leave during the day, the school issues an off-campus pass to leave. Also, some students do not have classes every school period; they are allowed to leave during school hours. Students exiting the school parking lot during the day are sometimes stopped by the police aide on the way to their cars for passes or schedules showing they are not supposed to be in class. One student testified that it is easy to forge a pass. If students are stopped trying to leave when they should be in class, they are taken to the campus police or an administrator. The campus police call the student's parents. The students are not physically restrained; if a student wants to go, he or she can go. But, if administrators are aware of a student leaving without authorization, they will call his or her parents.
The Palm Beach County School Board has a written truancy policy, Policy 6G×50-5.187. It defines an "absence" as not being present when attendance is checked, unless the student arrives in time to be counted "tardy." "Habitual truancy" is defined as a child having fifteen unexcused absences within ninety calendar days. According to Dwyer High School Assistant Principal William Basil, this policy refers to fifteen full days of absence without excuse before the habitual truancy procedures are invoked. Under the policy, principals have the duty to report habitually truant students to the School Board and to the Department of Highway Safety and Motor Vehicles, as required by section 1003.27(2), Florida Statutes (2005). The DMV notification is automatic when a student accumulates fifteen unexcused absences in a ninety-day period. The policy also requires the filing of a truancy petition under section 984.151 or a child-in-need-of-services petition under section 1003.27(3) in all cases of habitual truancy.
Attendance is taken in every class. If a student does not attend a class, he or she is marked absent on a computerized form, and at the end of the day, a phone dialer places a call reporting the absence to the student's home. The calls are placed even if a student misses only a single class. The calls are generally received at about 6:00 p.m. The message indicates that the student has been absent from one or more classes. Parents must write a note to get an absence excused. Notes from parents are periodically followed-up by phone calls to parents to verify their authenticity, but not every note is checked in this way. If the absence is unexcused, some teachers will allow the work to be made up, but others will not. Attendance is also indicated on the student's grade card, which is sent home to parents.
*263 When students are caught skipping school, the punishment can range from a call to the parents to suspension. The punishment is typically detention or in-school suspension. Parents are notified any time a student is disciplined in any manner. Teachers are asked to contact the assistant principal if a student has three unexcused absences. The school prints out a list of students who have excessive absences. The principal testified that he is alerted when a student accumulates ten absences, excused or unexcused, and a letter is mailed home to the parents. According to one student's testimony, "[e]veryone skips" and the teachers know about it, but they don't really stop it.
Kaitlin's father, John Kazanjian, filed an affidavit indicating that the School Board did not notify him of his child's truancy and that he did not give her permission to leave school with anyone other than family members. Kaitlin's close friend testified that Kaitlin used to make sure she was home when the school called to intercept the school's automated calls and delete them off the caller ID so that her parents would not find out that the school had called about her truancy. Principal Culp testified that Kaitlin did not have an excessive number of unexcused absences. She did not have ten absences, excused or unexcused, so a letter was never sent to her parents. She was never caught skipping school.
John S. Kazanjian, suing as the personal representative of the estate, brought a three-count complaint against Carlos Pozo, Jorge Fernando Pozo, and the School Board of Palm Beach County. On May 12, 2005, the School Board moved for summary judgment, arguing it owed no duty to supervise a truant student and, even if it did, a motor vehicle accident was not a foreseeable proximate cause of any such breach. It also argued that it was immune from suit for its discretionary policies.
A summary judgment presents a pure question of law, which is subject to de novo review. Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003).
Children have been skipping school "[s]ince at least the days of Huck Finn and Tom Sawyer." Hoyem v. Manhattan Beach City Sch. Dist., 22 Cal.3d 508, 150 Cal.Rptr. 1, 585 P.2d 851, 858 (1978). The primary purpose of Florida's truancy laws appears to be the promotion of academic success. See § 1003.26, Fla. Stat. (2005). These statutes are distinguishable from the more recently adopted closed campus policies at many schools (apparently including Dwyer), which are intended, at least in part, to promote student safety. See Hoyem, 585 P.2d at 854. Although the students involved in this case were absent from their classes and, thus, truant, it is significant that they left campus without authorization.
The plaintiff argues that Kaitlin, Pozo, and Lawrensen were habitually truant and that the School Board failed to follow the habitual truancy statutes to ensure their attendance. By statute, a "habitual truant" is a student who accumulates "15 unexcused absences within 90 calendar days." § 1003.01(8), Fla. Stat (2005). Though the statute does not address what happens when a student misses only part of a day, it is clear that a student cannot accumulate more than one absence per day, no matter how many classes he or she misses that day. The plaintiff's argument that each missed class is a separate absence, so that missing one full day of school would count as several unexcused absences, is an incorrect construction of the statute. Although the Palm Beach County School Board policy is poorly worded in defining an absence as missing *264 attendance, which is taken multiple times each day, it adopts the same "15 absences in 90 days" standard and is interpreted by school officials in conformity with the statute. At most, counting even one missed class as a full day's absence, Courtney Lawrensen had only six absences in a ninety-day period; Carlos Pozo had seven absences in ninety days, and Kaitlin Kazanjian had eight absences in ninety days. These students were not habitually truant, as a matter of law. Therefore, the principal had no duty to report them to the School Board or DMV or to file truancy petitions.
The plaintiff also argues that the School Board failed in its general duty to supervise these students. "A public school, at least through the high school level, undoubtedly owes a general duty of supervision to the students placed within its care." Rupp v. Bryant, 417 So.2d 658, 666 (Fla.1982). This duty is based on the school's standing partially in place of the student's parents. Id. "Mandatory schooling has forced parents into relying on teachers to protect children during school activity." Id. While Florida recognizes a general duty of supervision, a school has no duty to supervise "all movements of all pupils all the time." Id. at 668 n. 26.
To the extent that the plaintiff is arguing that the school owed a duty to supervise Kaitlin and/or Charles off school property, such an argument is foreclosed by both statute and case law. See § 1003.31(2), Fla. Stat. (2005) ("The duty of supervision shall not extend to anyone other than students attending school and students authorized to participate in school-sponsored activities."); Rupp, 417 So.2d at 668 n. 26 ("The school also has no duty to supervise off-premises activities of students which are not school related."); Matallana v. Sch. Bd. of Miami-Dade County, 838 So.2d 1191, 1192 (Fla. 3d DCA 2003) (holding that the school had no duty to supervise at the time of an incident which occurred off school premises and was unrelated to any school activity); Gross v. Family Servs. Agency, Inc., 716 So.2d 337, 339 (Fla. 4th DCA 1998) (stating that schools generally have not been held to have a duty of supervision when injuries occurred off-campus while students have been involved in non-school related activities); Palella ex rel. Palella v. Ulmer, 136 Misc.2d 34, 518 N.Y.S.2d 91, 93 (N.Y.Sup.Ct.1987) (holding that the school board had no duty to supervise once truant student was beyond its lawful control).
The plaintiff also seeks to impose liability upon the School Board for breaching a duty to prevent the students from leaving campus without authorization. A negligence cause of action is comprised of four elements; the first is a "duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks." Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003) (quoting W. PAGE KEETON ET AL., PROSSER AND KEATON ON THE LAW OF TORTS 164-65 (5th ed.1984)). As we wrote in Biglen v. Florida Power & Light Co., 910 So.2d 405, 408 (Fla. 4th DCA 2005):
The supreme court has made foreseeability the polestar to finding both the existence of a legal duty and its scope; "whenever a human endeavor creates a generalized and foreseeable risk of harming others," which the court describes as a "foreseeable zone of risk," the law generally places a duty upon a defendant "`either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.'" McCain v. Fla. Power Corp., 593 So.2d 500, 503 (Fla.1992) *265 (quoting Kaisner v. Kolb, 543 So.2d 732, 735 (Fla.1989)). The existence of a legal duty means that a defendant stands in a "`relation to the plaintiff as to create [a] legally recognized obligation of conduct for the plaintiff's benefit.'" Palm Beach-Broward Med. Imaging Ctr., Inc. v. Cont'l Grain Co., 715 So.2d 343, 344 (Fla. 4th DCA 1998) (quoting PROSSER AND KEATON § 42, at 274). The absence of a foreseeable zone of risk means that the law imposes no legal duty on a defendant, and therefore defeats a negligence claim.
In determining the existence of a legal duty, which is a question of law, a court allocates risk by "balancing the foreseeability of harm, in light of all the circumstances, against the burden to be imposed." Levy v. Fla. Power & Light Co., 798 So.2d 778, 780 (Fla. 4th DCA 2001) (quoting Vaughan v. E. Edison Co., 48 Mass.App.Ct. 225, 719 N.E.2d 520, 523 (1999)).
Cases from other jurisdictions hold that violation of a school's closed campus or truancy policy will not support a negligence action against a school board for personal injuries to third parties occurring off campus.
In Collette v. Tolleson Unified School District, No. 214, 203 Ariz. 359, 54 P.3d 828 (Ariz.Ct.App.2002), the school was alleged to have negligently enforced a closed campus policy. The plaintiff was a motorist struck by a student who had left campus without authorization during a lunch break. The Arizona court affirmed summary judgment in favor of the school:
¶ 16 The only conduct of the District at issue here is the alleged negligent enforcement of its modified closed-campus policy. Nothing happened to Thomason while at school that affected his ability to drive a car. Nor was Thomason's driving part of any school activity. The car Thomason was driving had not been provided to him by the District and the District had no reason to believe Thomason was an incompetent or dangerous driver. Thomason was driving on a public street with a valid driver's license for a personal purpose.
¶ 17 Plainly, the District had no power to control Thomason's actual operation of his vehicle. Appellants are really arguing that the District's duty to supervise its students gave rise to a duty to appellants to keep Thomason from driving his car at the particular time this accident happened. We do not believe reasonable persons would agree that such a duty exists, and decline to impose such a duty in this case for both practical and policy reasons.
Id. at 832-33 (citation omitted).
Similarly, in Thompson v. Ange, 83 A.D.2d 193, 443 N.Y.S.2d 918 (1981), the student struck another motorist while driving off-campus in violation of school rules. The New York court affirmed a summary judgment in favor of the school, stating:
The uncontroverted proof was that Graziano was a licensed driver. The schools' awareness of reckless driving by some students and their concern for student safety is not sufficient to show that Graziano was anything but the average 17-year old whom the Legislature has determined may be licensed to drive[ ]. There is no claim that the schools had notice that Graziano was an incompetent driver. The risk that Graziano would be involved in an automobile accident was no greater than the risk incurred by the operation of an automobile by any average 17-year old driver. Violation of the no-driving rule did not increase the risk of accident in any way; that risk existed regardless of any rule.
. . . .

*266 In short, although plaintiffs have been grievously injured in an automobile accident caused by a student driver violating a school rule and although driving by teenagers may be a matter of concern to schools and to the general public, we are not prepared to hold that these schools had the duty to shield the public from a student operating an automobile off the school grounds in violation of school rules.
Id. at 921.
We agree with Collette and Thompson that school rules relating to a student's presence on campus do not impose a legal duty of care running from the school board to third parties who are injured as a result of the negligent driving conduct of a student who has violated the school's policies.[1]
A related question is whether the high school owed a duty to prevent Kaitlin from leaving school property without authorization to protect her from off-campus dangers such as car crashes. The best Florida case for the plaintiff is Doe v. Escambia County School Board, 599 So.2d 226 (Fla. 1st DCA 1992). In that case the student was fourteen years old, but was performing mentally at a third or fourth grade level. A male student took her by the arm, walked her out to a car in the school parking lot, drove her off campus, and sexually assaulted her. The first district reversed a summary judgment for the school board, finding that the failure to supervise in both the school building and the school parking lot was actionable. We distinguish Doe because the student in that case was abducted rather than having left voluntarily.
Tollenaar v. Chino Valley School District, 190 Ariz. 179, 945 P.2d 1310 (Ariz.Ct. App.1997), is directly on point. The high school there had a closed campus policy, but its enforcement was lax. Shortly after arriving at school, the plaintiffs' children got into a car with another student and left campus. A collision with a tractor-trailer killed the plaintiffs' children. The Arizona court affirmed a summary judgment for the school, holding that the school exposed the students only to the ordinary risks of vehicular collision that "`[m]embers of our mobile society face . . . whenever they are in cars.'" Id. at 1311 (quoting Rogers ex rel. Standley v. Retrum, 170 Ariz. 399, 825 P.2d 20, 24 (Ariz.Ct.App.1991)). The Tollenaar court went on to hold that the exposure to that foreseeable risk did not amount to exposure to an unreasonable risk, creating no duty of care. Id.
New York and California have taken different stances on the precise question of duty presented by these facts. California has held that a duty exists, but emphasizes that the duty is one of "ordinary care, not fortresses; schools must be reasonably supervised, not truant-proof." Hoyem, 585 P.2d at 857. New York, on the other hand, appears to recognize no such duty, at all. In Palella, a 14-year old skipped school and went joyriding with his friends, which ended in a police chase and a car crash with grievous injuries. The court granted the school's motion for summary judgment, stating:

*267 In this case, the infant plaintiff intentionally absented himself from the physical custody and control of the School District. Nothing short of a prison-like atmosphere with monitors at every exit could have prevented the infant from leaving the school grounds on the day in question. This court is not prepared to mandate that a school district must employ security measures to insure that its students comply with reasonable attendance policies.
518 N.Y.S.2d at 93; see also Glaser ex rel. Glaser v. Emporia Unified Sch. Dist. No. 253, 271 Kan. 178, 21 P.3d 573 (2001) (holding that a middle school owed no duty to a student who ran off campus into traffic).
Whether there is a duty to prevent a student from leaving campus without authorization depends on the age of the student. Such a duty seems clear at the elementary school level, yet is anything but clear at the high school level. See Rogers, 825 P.2d at 25 ("Nor do we suggest that a calculus of unreasonable risk will yield equivalent results at every level of the schools. We leave for resolution in other unsupervised egress cases such questions as whether parents' supervisory expectations may reasonably differ at differing levels of the schools and whether the risks that may be deemed unreasonable may likewise differ with the age of the student involved.").
Recently, in Clay Electric, the Florida Supreme Court quoted the elements of negligence from Prosser and Keeton on the Law of Torts, which quotes the duty element as follows:
A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

873 So.2d at 1185 (quoting Prosser and Keeton on the Law of Torts 164-65 (W. Page Keeton ed., 5th ed.1984)) (emphasis added). We conclude that, for a high school student, skipping school is simply not so dangerous as to pose an "unreasonable risk" of harm, and thus should create no duty of care.
Teenage drivers are statistically worse drivers than adults, as the insurance actuarial data shows. However, we as a society have determined that they are safe enough to be on the roads; riding with a licensed teenage driver should not be considered an unreasonably risky undertaking. See Tollenaar, 945 P.2d at 1311. According to the plaintiff, the legislature's enactment of a law providing for the suspension of habitually truant students' driver's licenses demonstrates that our law-makers recognize that habitually truant students are a safety risk on the roads.[2] However, we can find no legislative history or statistics to support plaintiff's position. It seems far more likely that the legislature simply intended to use a driver's license as a coercive tool to keep high school students in class. The statute does not signify a legislative determination that truant students are worse drivers than their contemporaries. In any event, as previously pointed out, none of these students were habitually truant.
In Palm Beach-Broward Medical Imaging Center, Inc. v. Continental Grain Co., 715 So.2d 343, 345 (Fla. 4th DCA 1998), we stated:
In applying the "foreseeable zone of risk" test to determine the existence of a legal duty, the supreme court has focused on the likelihood that a defendant's conduct will result in the type of injury suffered by the plaintiff. This *268 aspect of foreseeability requires a court to evaluate
whether the type of negligent act involved in a particular case has so frequently previously resulted in the same type of injury or harm that `in the field of human experience' the same type of result may be expected again.

Pinkerton-Hays Lumber Co. v. Pope, 127 So.2d 441, 443 (Fla.1961).
(emphasis omitted). Applying this standard, we hold that no duty exists. As the record demonstrates, high school students routinely skip school yet, as the paucity of reported cases shows, horrific car crashes while skipping school are exceedingly rare. See id. at 346. Placing liability on the school board for off campus automobile accidents involving high school students would encourage the imposition of hyper-restrictive conditions on high school campuses. The off-campus dangers confronting high school students are risks that should be confronted by students and their parents. We conclude that in the context of a negligence cause of action brought on behalf of a student injured off campus, a school may not be held liable for injuries suffered by a student who has violated the school's campus attendance policies.
In any event, we believe that sovereign immunity bars the plaintiff's suit against the School Board. The School Board is immune from suit for its discretionary planning level policies regarding parking permits, student parking, and penalties for student breaches of school attendance and parking rules. See Orlando v. Broward County, Florida, 920 So.2d 54 (Fla. 4th DCA 2005) (holding that school board's decision as to school hours was a planning-level decision for purposes of school board's entitlement to sovereign immunity in action by mother of child who was killed while crossing a street on his way home from school), review denied, 934 So.2d 450 (Fla.2006).
A high school may have sound educational reasons for wanting to treat its students with the dignity which comes with freedom of movement, rather than as young children or prisoners. See Wilson v. County of San Diego, 91 Cal.App.4th 974, 111 Cal.Rptr.2d 173, 178 (2001) (discussing decision not to make children's center a lockup facility to avoid treating juveniles as if they had committed a crime). The decision whether to have an open campus, a "fortress," or something in-between, is a policy decision that should be left to school professionals and not second-guessed by civil juries. Orlando v. Broward County, 920 So.2d at 57.
As to the plaintiff's other point on appeal concerning the School Board's Renewed Motion for Protective Order, we find no abuse of discretion in the trial court's granting such motion.
Affirmed.
WARNER and GROSS, JJ., concur.
NOTES
[1] We note that in Louis v. Skipper, 851 So.2d 895 (Fla. 4th DCA 2003), this court confronted a claim by a third party injured by an automobile driven by a student on a school sanctioned field trip. The injured party sued the school board, arguing that the student was an agent of the board at the time of the accident. We affirmed a summary judgment in favor of the school board, "[i]nasmuch as the student [driver] was neither an employee of the school board, nor driving a school board vehicle." Id. at 896. Louis involves a claim of agency, not a claim that violation of a school board policy amounted to negligence.
[2] § 1003.27(2)(b), Fla. Stat. (2005).