WATERMAN, Justice
(dissenting).
I respectfully dissent. The majority opinion is an example of the aphorism that bad facts can make bad law. The mental disability of the fourteen-year-old special education student-victim makes this a harder case. Yet, the school district’s tangential role in the events leading to her sexual assault by another student after school hours off campus is too attenuated to support liability under traditional tort law or the Restatement (Third) of Torts. This court should not extend liability to *706 her teachers or the school district under the facts of this case: D.E. skipped her last class, lied to her mother about her after-school plans, found her boyfriend, willingly accompanied him to a convenience store, and joined him inside another student’s parents’ private garage where the sexual assault occurred. The majority’s unprecedented expansion of school-district liability for injuries well outside school activities is unwarranted and lacks any workable limiting principle.
A saving grace today is the majority’s determination that this school district failed to preserve error on the no-duty issue. This leaves the door open in future cases for school districts to argue that, as a matter of law, their duty of care is limited “to risks that occur while the student is at school or otherwise engaged in school activities.” Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40 cmt. I, at 45 (2012) [hereinafter Restatement (Third) ]. I believe this bright-line rule precludes recovery against the school district here under the no-duty rule recognized in section 7(b) of the Restatement (Third). See McCormick v. Nikkel & Assocs., Inc., 819 N.W.2d 368, 374 (Iowa 2012) (noting section 7(a)’s general duty of care is “subject to ‘an articulated countervailing principle or policy’ ” in section 7(b), which “ ‘may be reflected in longstanding precedent’ ” (quoting Restatement (Third) § 7(b) cmt. a, at 77-78 (2010))).[8]
The majority cites no case from Iowa or elsewhere holding that a school district can be held liable when a student who skips school ends up being sexually abused by a fellow student away from the school premises and after the end of the school day. I disagree with the majority’s determination that the school district failed to preserve error on the no-duty question in its motion for directed verdict, although the question is close. Defense counsel argued the facts supporting a no-duty ruling and argued there was no liability as a matter of law. But he failed to use the word “duty” and did not cite section 7(b) or comment l to section 40 of the Restatement (Third) in his directed verdict motion. Nevertheless, he clearly intended to include a no-duty ground. I would be more forgiving as to the specificity required to avoid an involuntary waiver on the interrelated issues of duty, breach, causation, and scope of liability. After all, our court only recently adopted the Restatement (Third) scope-of-liability approach, when neither side raised or briefed the issue, in Thompson v. Kaczinski, 774 N.W.2d 829 (Iowa 2009). So why not reach the no-duty issue today when it is fully briefed by these parties? In any event, I would hold that the school district’s motion for directed verdict based upon scope of liability — what we used to call proximate cause — should have been granted and that there was insufficient evidence of negligence to submit the case to the jury.
*707 The victim’s special education status does not get this case to the jury. Federal law requires that special education students be educated in the “[ljeast restrictive environment” and “[t]o the maximum extent appropriate ... with children who are not disabled.” Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1412(a)(5) (2006). See generally Ralph D. Mawdsley, Standard of Care for Students with Disabilities: The Intersection of Liability Under the IDEA and Tort Theories, 2010 B.Y.U. Educ. & L.J. 359 (2010). The idea is to mainstream the student. That was the approach taken with D.E. by the school district. A team of educators and D.E.’s mother had developed an Individualized Education Program (IEP) to accommodate her specific needs. See 20 U.S.C. § 1414. Special education students are subject to the same school procedures as any other student unless the IEP provides differently. D.E.’s IEP did not require any escort for her between classes or leaving school. D.E.’s IEP subjected her to the same attendance requirements as other students and required no special notification to her mother if she missed a class. D.E.’s mother never asked the school to notify her immediately if D.E. skipped class. No claim is made that any act or omission of the school district violated the IDEA or D.E.’s IEP. The district generally owes no duty to a special education student to provide services beyond those specified in the IEP. Cf. Pahssen v. Merrill Cmty. Sch. Dist., 668 F.3d 356, 366-67 (6th Cir.2012) (affirming summary judgment for school district on sexual assault claim because it owed no duty to supervise disabled student beyond period specified in IEP); Worthington v. Elmore Cnty. Bd. of Educ., 160 Fed.Appx. 877, 881-82 (11th Cir.2005) (affirming summary judgment for school district on sexual assault claim because IEP did not require additional adult supervisor on bus transporting special-needs student). In fact, plaintiffs’ argument that the school should have restricted D.E.’s movements between classes after fifth period would likely have resulted in a violation of federal law, unless the school restricted the movement of all students. Thus, D.E.’s mental disability does not support extending the school district’s liability to reach this off-campus, after-hours, private assault.
The facts, viewed in the light most favorable to the verdict, do not support a finding of negligence. D.E. was a freshman Level II special education student at Kennedy High School, which had 1834 students during the 2007-2008 school year. D.E. suffered from mild mental retardation. Her reading was at the third-grade level and her math skills were at the fifth- or sixth-grade level. D.E. took her academic subjects in special education classrooms and subjects like physical education and ceramics with the general school population. The special education classes were generally smaller than regular classes and usually contained an additional instructor, a teacher’s associate.
Although the majority says that D.E. was “rarely, if ever, without direct adult supervision because of her diminished capacity,” the record does not support this. In fact, like other general education and Level II special education students, D.E. went between classes on her own, going outside the building when that was the most convenient route. Also, on the day in question, D.E.’s mother had given D.E. permission to ride the bus to another special education student’s house after school. D.E.’s IEP stated, “[D.E.] is capable of performing daily living skills on her own except for managing her finances independently.”
Instead of riding the bus to that friend’s house that day, D.E. and the friend walked out of the school building one class period *708 early. They met up with a senior, M.F., another special education student. No teacher saw them leave together. M.F. regarded D.E. as his girlfriend and said she wrote him a note earlier that day saying she wanted to have sex with him. According to D.E., they were picked up by a fourth student who was driving a car while they were walking along the street some distance from the school. The fourth student drove them to M.F.’s grandparents’ house, where various adults were present. After about twenty minutes, M.F. and D.E. left the grandparents’ house. They went to a gas station where they bought a condom. They then walked to the home of yet another friend of M.F.’s, who was also a special education student. At about 4:10 or 4:15 p.m., approximately one and a half hours after the end of the school day, M.F. and D.E. entered the garage of M.F.’s Mend’s house. M.F. had sex with D.E. while M.F.’s friend was shooting BBs at her. M.F. was nineteen and D.E. was fourteen at the time; M.F. subsequently was charged with and pled guilty to third-degree sexual abuse.
There is no evidence that M.F.’s assault on D.E. was reasonably foreseeable to the school district. Her teacher saw D.E. and M.F. touching affectionately and romantically, behavior that is not uncommon at a high school. Her teacher knew D.E. skipped the last class period and without phoning the mother during class, recorded her absence to trigger parental notification that evening. The majority concludes these facts justify imposing liability on the district for M.F.’s assault on D.E. I disagree. The IEP did not require extra supervision for D.E. or immediate notice to her mother if she missed a class. D.E. lied to her mother about her after-school whereabouts; her intended liaison with M.F. was likely to occur somewhere, sometime whether or not she skipped her last class. She was not abducted from school. The school’s conduct had no more than a “ ‘serendipitous causal connection’ ” to M.F.’s sexual assault on D.E. hours later and miles away, which places his criminal act outside the school’s scope of liability. See Royal Indem. Co. v. Factory Mut. Ins. Co., 786 N.W.2d 839, 851-52 (Iowa 2010) (noting the defendant’s conduct must increase the risk of harm to fall within the scope of liability and that a mere “serendipitous causal connection” is insufficient (quoting Restatement (Third) § 30 cmt. b, at 544)).
The majority relies on cases from other jurisdictions that are readily distinguishable as involving a breach of the duty of care at the time of dismissal of young children. In Jerkins v. Anderson, the New Jersey Supreme Court affirmed an appellate decision reversing summary judgment for the school district when a nine-year-old student was struck by a car walking several blocks from school after an early dismissal. 191 N.J. 285, 922 A.2d 1279, 1281 (2007). The Jerkins court focused on the school’s “duty of reasonable care to supervise children at dismissal” and noted the father (who arrived at the normal closing time to pick up his child) claimed he was not notified the children would be released early. Id. at 1281-82. The court concluded “the sparse record ... may not foreclose liability.” Id. at 1291. The court cautioned that a “school district’s responsibility has temporal and physical limits,” and that schools are not “guarantors of students’ safety with respect to all activities during or after dismissal.” Id. The court focused on the elementary school’s absence of a dismissal policy. Id. at 1288-90.
Because D.E.’s IEP permitted her to go to and from school and between classes unescorted, Jerkins is inapposite. So, too, is Perna v. Conejo Valley Unified School District, 143 Cal.App.3d 292, 192 Cal.Rptr. *709 10 (1983). In that case, two students kept late by a teacher after school were struck by a car at the adjacent intersection after the shift ended for the crossing guards there. Id. at 10-11. The court held a jury question existed as to the “district’s alleged failure to exercise due care in supervising the plaintiffs on school premises.” Id. at 12.
Equally inapposite is the pair of Louisiana cases cited by the majority. Both found the school district could be liable for the school’s negligent supervision of six-year-olds at the time of dismissal. In Gary v. Meche, an unsupervised six-year-old ran into the side of a truck that was driving in front of the school at dismissal time. 626 So.2d 901, 902 (La.Ct.App.1993). In Sutton v. Duplessis, a six-year-old was placed in the school office to wait for her mother. 584 So.2d 362, 363-64 (La.Ct.App.1991). The child wandered off unnoticed by the secretary assigned to watch him and went to a friend’s home a block away where the parent sent him walking back to school; he then darted into the path of a car. Id. at 364. The court held “the school authorities should have foreseen that a six-year-old might disobey orders not to leave, especially when he realized that no adult was actually watching him.” Id. at 366.
The majority overlooks recent Louisiana precedent that is more factually analogous. In Huey v. Caldwell Parish School Board, a sixteen-year-old female student contrived excuses to convince the school bus driver to let her off early for clandestine sexual liaisons. 109 So.3d 924, 926 (La.Ct.App.2013). In affirming summary judgment for the school board, the appellate court concluded “the concept of legal cause is necessary to cut off liability at some point. In this case, too much has intervened, and this risk is not within the scope of [the school’s] duty.” Id. at 930. The same reasoning applies here.
The best case for the majority is Doe v. Escambia County School Board, 599 So.2d 226 (Fla.Dist.Ct.App.1992). That court reversed summary judgment for the school to reinstate claims arising from the off-campus rape of a fourteen-year-old mentally disabled girl based on a factual dispute over whether the school had negligently supervised the school building and parking lot where, during her lunch period, “a male student took her by the arm, walked her out to the school parking lot, put her in a car, and took her to a house.” Id. at 227-28. Three teachers were aware the victim was acting strangely that morning “because she twice changed out of her conservative dress into a mini-skirt. Each time a teacher compelled her to change back into the dress she initially wore to school.” Id. at 227. Such behavior warranted more supervision. Another Florida appellate court “distinguish[ed] Doe because the student in that case was abducted rather than having left voluntarily.” Kazanjian v. Sch. Bd., 967 So.2d 259, 266, 267 (Fla.Dist.Ct.App.2007) (affirming summary judgment for school district on claim by estate of student killed in an off-campus car accident after skipping school). Doe is inapposite. D.E. exhibited no unusual behavior warranting greater supervision at school and skipped her last class that day voluntarily — she was not abducted at school by M.F.
The great weight of authority holds as a matter of law that schools are not liable for assaults occurring off campus after school hours and outside of school activities. The majority attempts to sidestep these cases because they were decided “using the old duty framework of the Restatement (Second)” and the duty issue was not preserved below. But, as the majority acknowledges, “consistent with the frame *710 work of the Restatement (Third), courts may use either duty or scope-of-liability determinations to limit liability in negligence cases.” In McCormick, we discussed how the law of duty remains intact in important ways after Thompson:
Historically, the duty determination focused on three factors: the relationship between the parties, the foreseeability of harm, and public policy. [Thompson, 774 N.W.2d] at 834. In Thompson, we said that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent. Id. at 835. But we did not erase the remaining law of duty; rather, we reaffirmed it. Id. at 834-36. In short, a lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion.
McCormick, 819 N.W.2d at 371 (emphasis added). We reiterated “that our previous law of duty was otherwise still alive and well.” Id. We affirmed summary judgment for the defendant electrical subcontractor under the control rule that predated Thompson. Id. at 375; see also Feld v. Borkowski, 790 N.W.2d 72, 76-77 & n. 1 (Iowa 2010) (applying contact-sports rule that predated Thompson to tort claim arising from injury to player during high school intramural softball game because the Restatement (Third) “expresses the notion that a reasonable-care duty applies in each case unless a special duty, like the contact-sports exception, is specifically recognized” (citing Restatement (Third) § 7, cmt. a, at 77)). It is true the Restatement (Third) provides a new analytic approach, but it is wrong to conclude cases previously subject to dismissal by summary judgment now must go to the jury. “Our court’s recent adoption of sections of the Restatement (Third) of Torts is not the death knell for summary judgments in negligence cases.” Hoyt v. Gutterz Bowl & Lounge, L.L.C., 829 N.W.2d 772, 783 (Iowa 2013) (Waterman, J., dissenting) (citing McCormick, 819 N.W.2d at 371-75).
I believe the numerous no-liability school cases would have the same outcome under the Restatement (Third) because the harm to the plaintiff was outside the scope of the school’s liability and because of the limited nature of the school’s duty under section 40, comment l. A defendant’s conduct may fall outside the scope of liability when, as here, it does not increase the risk of harm to plaintiff, or because the intervening criminal act was not reasonably foreseeable. See Restatement (Third) § 34 cmt. e, at 589 (“In cases in which the source of the risk is an intervening act, the foreseeability of the intervening act will determine whether an actor’s liability extends to any harm that occurs.”). In Royal Indemnity, we observed:
The concepts embodied in the Restatement (Third), however, have largely been adopted from various sections of the Restatement (Second). See [Restatement (Third) ] § 29 cmt. a, at 493.... (stating that there was a limit on the scope of liability for tortious actions under the Restatement (Second), however, components of this limit were expressed in several different sections throughout the Restatement (Second)) .... We also note that the result under a Restatement (Second) analysis would be the same.
786 N.W.2d at 849 (emphasis added). The Restatement (Third) does not tilt the playing field; rather, as we noted in Royal Indemnity, the result under the Restatement (Second) would be the same.
Unlike the majority, I would not disregard persuasive authority from other jurisdictions merely because those states have not joined Iowa in adopting the scope-of- *711 liability approach articulated in the Restatement (Third). See, e.g., Hill v. Safford Unified Sch. Dist., 191 Ariz. 110, 952 P.2d 754, 756, 761 (Ct.App.1997) (holding the school not liable for an after-hours, off-premises student shooting because “as a matter of law [the school] could not have taken reasonable measures that probably would have prevented the attack” (citation and internal quotation marks omitted)); Concepcion v. Archdiocese of Miami, 693 So.2d 1103, 1105-06 (Fla.Ct.App.1997) (affirming summary judgment for school district on negligence claims arising from off-campus, after-hours fight between students of rival schools); Beshears v. Unified Sch. Dist. No. S05, 261 Kan. 555, 930 P.2d 1376, 1378, 1383 (1997) (affirming summary judgment for school district on claims it failed to prevent “an after school hours, off school premises ... prearranged fight between two high school sophomores”); Maldonado v. Tuckahoe Union Free Sch. Dist., 30 A.D.3d 567, 817 N.Y.S.2d 376, 377-78 (2006) (affirming summary judgment for school district dismissing claims it failed to protect student attacked at night at her home by a suspended student who had threatened her at school); Edson v. Barre Supervisory Union # 61, 182 Vt. 157, 933 A.2d 200, 202-04 (2007) (holding that a school has a duty “to protect students only from foreseeable risks” and finding the off-the-premises murder of a student after she skipped class was unforeseeable).
The Vermont Supreme Court recognized that to impose liability on schools for crimes occurring when a troubled student skips school would result in higher security costs that divert resources from the primary mission of schools — education:
Elevating the duty of care to ensure that students with known truancy, drug abuse, or other behavioral problems remain on campus would not only be financially and logistically burdensome, but would likely detract from schools’ primary purpose by diverting significant resources from education to security. Under the circumstances of this case, nothing short of continuous, immediate supervision would have prevented De-Andra from voluntarily leaving school and going to Martin’s home.... Vermont schools are neither equipped nor expected to provide such constant supervision to students, even those with a troubled history.
Edson, 933 A.2d at 206 (citation omitted). This is equally true of Iowa schools. In Brokaw v. Winfield-Mt. Union Community School District, we admonished that “ ‘excessive precautions’ ” should not be required to avoid the risk of harm from even “ ‘somewhat foreseeable’ ” improper acts of third parties. 788 N.W.2d 386, 392, 393-94 (Iowa 2010) (quoting Restatement (Third) § 19, cmts. g-h, at 220-21) (affirming bench trial judgment for school on claims arising from student assault during basketball game). The majority today disregards that admonition by requiring high schools to take excessive precautions.
Teachers can be teaching or contacting parents, but cannot do both effectively at the same time. The principal of Kennedy High School, Mary Wilcynski, testified at trial as to why it would be unrealistic to require a teacher to phone the parent when a student is not in class:
It’s unrealistic to assume that a teacher can stop helping kids learn and being in charge of the classroom, go to the phone and make — figure out the phone number, figure out where the parent is, working or at home or whatever, call them and say, I see that it’s ten to two and your child is not in my class. The student might have gotten a pass to come to the office. The student might have gotten a pass to go somewhere *712 else. An administrator might be talking to them. They might be seeing their counselor. There can be a myriad of different places they could legitimately be. So for a teacher to say — to try to contact a parent on the immediate absence is unrealistic.
Why should our court be the first in the nation to hold a school can be found negligent for failing to immediately notify the parent of a high school student that she is not in class last period? I would not impose this unrealistic burden on teachers, particularly when it is entirely speculative whether D.E.’s plan to meet privately with M.F. would’ve been thwarted by her mother if she had received a phone call earlier.
It is not surprising that other courts refuse to impose liability on schools for injuries occurring when high school students skip classes. In Kazanjian, several eleventh graders skipped school and were involved in a fatal car accident. 967 So.2d at 261-62. In affirming summary judgment for the school district, the court stated:
[W]e hold that no duty exists. As the record demonstrates, high school students routinely skip school yet, as the paucity of reported cases shows, horrific car crashes while skipping school are exceedingly rare. Placing liability on the school board for off campus automobile accidents involving high school students would encourage the imposition of hyper-restrictive conditions on high school campuses. The off-campus dangers confronting high school students are risks that should be confronted by students and their parents. We conclude that in the context of a negligence cause of action brought on behalf of a student injured off campus, a school may not be held liable for injuries suffered by a student who has violated the school’s campus attendance policies.
Id. at 268 (citation omitted).
Another Florida appellate court observed that a school’s duty of supervision ends when the student leaves school, and to hold otherwise makes schools insurers of student safety until they arrive at home:
We fully concur with Oglesby ⅛ holding that a school has no duty to supervise off-campus, non-school related activities occurring during non-school hours. Any holding to the contrary would essentially make school officials insurers of all students’ safety until the students return home each day. We decline to place such an unreasonable and onerous burden on school officials. At some point, we believe that a school’s obligation of reasonable supervision must come to an end and the parent or guardian’s duty of supervision must resume. That logical point, we think, should be when the student leaves the school’s premises during non-school hours and is no longer involved in school-related activities.
Concepcion, 693 So.2d at 1105 (citing Oglesby v. Seminole Cnty. Bd. of Pub. Instruction, 328 So.2d 515, 516-17 (Fla.Dist.Ct.App.1976)).
This case involves no preventable criminal act at school such as an abduction. The majority fails to articulate any persuasive reason to diverge from the well-settled authority enforcing a bright-line rule limiting school liability to injuries occurring on school grounds or during school activities. The bright-line rule makes sense because a school cannot control the conduct of teenagers after hours, off-campus, outside of a school activity with no teacher present. See McCormick, 819 N.W.2d at 374 (noting rule that liability follows control makes sense because “[t]he party in control ... is best positioned to *713 take precautions to identify risks and take measures to improve safety”). I would continue to apply that rule in our state, consistent with comment l to section 40 of the Restatement (Third) of Torts.
For the foregoing reasons, the defendant school district was entitled to a directed verdict.
MANSFIELD, J., joins this dissent.

. The decision of our court of appeals reversing a directed verdict for the defendant in Hill v. Damm, 804 N.W.2d 95 (Iowa Ct.App.2011), is consistent with this bright-line rule. There, a school bus driver dropped a thirteen-year-old student off at the wrong stop despite specific, credible warnings from her mother to avoid that stop to prevent contact with a pedophiliac neighbor. Id. at 96-97. The mistake by the driver predictably put the child directly into harm’s way — she was abducted by the neighbor at that stop and later murdered. Id. at 97. A school district’s duty of care extends to transporting students to a safe exit from a school bus. See Burton v. Des Moines Metro. Transit Auth., 530 N.W.2d 696, 700 (Iowa 1995). By contrast, the victim in this case was not mistakenly transported by school bus to a foreseeably dangerous location; rather, she skipped school on her own without any notice to the school of a reasonably foreseeable third-party threat to her safety.