MANSFIELD, Justice.
This case presents the question whether a subcontractor that properly performs electrical work on a jobsite, then locks up the work and transfers control to the property owner, owes a duty of care to an employee of the owner electrocuted six days later when the owner fails to deener-gize the work site in contravention of various warnings and regulations. We conclude that no such duty is owed under the circumstances. Accordingly, we affirm the summary judgment granted by the district court and vacate the decision of the court of appeals reversing that grant of summary judgment.
I. Facts and Procedural Background.
Little Sioux Corn Processors operates an ethanol plant located near Marcus, Iowa.[1] In 2006, Little Sioux was expanding the capacity of that plant. Part of that expansion involved electrical upgrades and changes. Little Sioux hired Fagen Engineering, Inc. to design the new electrical loop and to specify the electrical equipment to be included in the loop. Little Sioux purchased the electrical equipment needed for the electrical loop from Gray-bar Electric. Among the items purchased from Graybar were several switchgears. A switchgear is a large metal cabinet mounted on a pad that receives and transmits high-voltage electricity and, through mechanically operated switches, controls the overall flow of electricity within the distribution system.
Little Sioux hired a contractor, Schoon Construction Company, to work on the electrical loop by boring in and pulling the electrical cables that connected the components of the new electrical loop and placing and installing the switchgears on their mounting basements. Schoon in turn hired the defendant, Nikkei & Associates, Inc., to do “terminations,” which involved hooking up electrical cables to terminals in the switchgears. This work was performed by early October 2006, and the lines were energized through the swit-chgears.
Little Sioux also purchased fault indicators from Graybar. These optional devices were to be mounted inside the switchgear cabinet. A fault indicator signals when there is an interruption or fault in the electrical circuit.
The original plan was for Nikkei to install the fault indicators inside the cabi *370 nets. However, it turned out the holes on the mounting brackets were too small. On November 7, 2006, Ken (Buford) Peterson, of Nikkei, spoke with Russell Konwinski, Little Sioux’s maintenance manager, and offered to drill out the holes in the brackets. To save money, Konwinski declined the offer and said he would have his personnel modify the mounting brackets and install them in the switchgear cabinets.
Peterson left the work site pending the completion of that task. When Peterson left, the switchgear cabinets were closed and secured with penta-head bolts that could only be removed through the use of a special penta-head socket wrench, which Little Sioux had ordered along with the electrical equipment. In addition, the switchgear cabinets bore signs warning of the hazard of high voltage.
Six days later, on November 13, 2006, Little Sioux’s Konwinski asked fellow employee Mike Jacobson, an electrician, to remove, drill out, and install the fault indicator brackets. Jacobson said he needed help because of other things going on, so Konwinski assigned Jeff Sangwin and Troy McCormick, the plaintiff, to assist Jacobson. Konwinski believed the switchgears were not energized and so informed the group.
Little Sioux’s general manager, Steve Roe, knew that Switchgear # 4, where the accident occurred, was energized on November 13. In fact, it had to be energized in order for the plant to be running because it was on the line between the main panel and the plant.
Peterson reenergized the electrical circuit from the main panel to Switchgear # 4 before he left the site on November 6. Peterson claims he energized the line in the presence of Konwinski and Jacobson. However, in an affidavit, Konwinski denied he was present. Konwinski also stated in his affidavit, “I had asked Buford Peterson to tell when the power would be turned on but I was not told by him before November 13, 2006, that it was on.”
It is undisputed that both Little Sioux’s and OSHA’s safety regulations required employees to deenergize and lock out or tag electrical equipment before beginning work. These rules required the employee to assume all electrical equipment was energized until proven otherwise. The lockout/tag procedures were not followed by the Little Sioux employees the day McCoi'-mick was injured.
After being assigned to remove, drill out, and install the brackets, Jacobson used the penta-head socket wrench to open two of the switchgear cabinets so the brackets could be removed and the holes redrilled. However, when Jacobson was called away to help with another project at the plant, he left McCormick and Sangwin to complete the work. Neither McCormick nor Sangwin had prior electrical training. McCormick used the wrench to open the cabinet door to Switchgear # 4. After removing the bracket and redrilling the holes, McCormick received a severe electrical shock when he tried to reinstall the bracket in the cabinet. He survived but sustained substantial injuries.
McCormick and his spouse sued Nikkei, alleging it had control of the switchgear box and failed to warn him the switchgear was energized. Nikkei moved for summary judgment on the grounds that it owed no duty to McCormick because it did not have control of the switchgear box when McCormick was injured. Nikkei argued the relevant duties rested with Little Sioux, which owned and controlled the switchgear box and controlled the work being performed by McCormick at the time of the accident.
The district court granted Nikkei’s motion for summary judgment. It agreed *371 with Nikkei that it owed no duty to McCormick because Nikkei did not have control of the switchgear box when McCormick performed work on it and was injured. The court found, rather, that Little Sioux had retained control over the electrical work that caused McCormick’s injury. As the court put it, “[T]he controlling issue is control of the premises.” The court also concluded that whether Petersen warned anyone the switchgear was energized was not a material fact because “Little Sioux had a duty to provide a safe workplace to Troy McCormick, which includes testing electrical equipment to see if it is energized, in accordance with OSHA and Little Sioux policy.”
McCormick appealed, and the court of appeals reversed the district court’s grant of summary judgment. It reasoned that Nikkei was in control “when the alleged negligent act occurred,” i.e., when Peterson energized the line prior to McCormick’s injury.
Nikkei sought, and we granted, further review.
II. Standard of Review.
We review a trial court’s grant of summary judgment for correction of errors at law. On motion for summary judgment, the court must: (1) view the facts in the light most favorable to the nonmoving party, and (2) consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record. Summary judgment is appropriate if “there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.” The existence of a legal duty is a question of law for the court to decide.
Van Fossen v. MidAmerican Energy Co., 777 N.W.2d 689, 692-93 (2009) (citations omitted).
III. Analysis.
A. Duty and the Control Principle. An actionable negligence claim requires “the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages.” Thompson v. Kaczinski, 774 N.W.2d 829, 884 (Iowa 2009) (citation and internal quotation marks omitted). “Whether a duty arises out of a given relationship is a matter of law for the court’s determination.” Id.
Historically, the duty determination focused on three factors: the relationship between the parties, the foreseeability of harm, and public policy. Id. at 834. In Thompson, we said that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent. Id. at 835. But we did not erase the remaining law of duty; rather, we reaffirmed it. Id. at 834-36. In short, a lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion.
In Van Fossen, we made clear again that our previous law of duty was otherwise still alive and well. Thus, we held that employers of independent contractors do not owe a general duty of due care under Restatement (Third) of Torts section 7, but owe only a limited duty as described in Restatement (Second) of Torts section 413. Id. at 696-97. We reiterated that “[u]nder the retained control standard, one who employs an independent contractor is not liable unless he retains control of the contractor’s day-today operations.” Id. at 697. Van Fossen thus illustrated one example where the relationship between the parties resulted in no general duty of reasonable care. As we explained,
*372 The limited nature of the duty owed by employers of independent contractors takes into account the realities of the relationship between employers and their contractors. One of these realities is that employers often have limited, if any, control over the work performed by their contractors. Employers typically hire contractors to perform services beyond the employers’ knowledge, expertise, and ability. The contractors’ knowledge and expertise places them in the best position to understand the nature of the work, the risks to which workers will be exposed in the course of performing the work, and the precautions best calculated to manage those risks. These realities dictate that the persons in the best position to take precautions to manage the risks are the contractors. The policy of the law therefore justifies the rule placing the primary responsibility on the contractor for assuring proper precautions will be taken to manage risks arising in the course of the performance of the work. The same realities justify the well-established rules limiting the liability of employers of independent contractors to the circumstances specified in Restatement (Second) sections 413, 416, and 427. If liability were not limited in this fashion, inefficiencies would result as employers would be required to develop the knowledge and expertise in their contractors’ fields so as to be prepared to understand even the ordinary risks involved in the work and assure that the precautions necessary to manage those risks are taken.
Id. at 698.
This law is of long standing in Iowa. For example, in Robinson v. Poured Walls of Iowa, Inc., 553 N.W.2d 873, 874 (1996), a worker was injured while excavating a clogged sewer pipe that had been installed by the defendant. The defendant had hired the plaintiffs firm to do the repair work when the sewer line malfunctioned. Id. We affirmed the grant of the defendant’s motion for summary judgment based on absence of duty, reasoning that the plaintiffs employer, not the defendant contractor, had control over the work. Id. at 875-76; see also Hoffnagle v. McDonald’s Corp., 522 N.W.2d 808, 813 (1994) (holding that “[wjhether a franchisor owes a duty of care to its franchisee’s employee ... turns on the extent of the franchisor’s retained control over the property and the daily operation of the restaurant”); Downs v. A & H Constr., Ltd., 481 N.W.2d 520, 523-25 (Iowa 1992) (finding that a contractor owed no duty to the employee of a subcontractor who was injured by allegedly unsafe scaffolding because although the employer provided some of the materials for the scaffolding, the subcontractor controlled how the scaffolding was erected).
In Van Essen v. McCormick Enterprises Co., we held a landlord that had installed a grain bin, but no longer controlled it, owed no duty to an employee of the lessee who was subsequently injured due to the allegedly hazardous condition of the bin. 599 N.W.2d 716, 720 (Iowa 1999). Although that case specifically involved the duties of an owner/lessor, we emphasized using italics, “ ‘The general rule and exceptions ... reveal a common principle: liability is premised upon control.’” Id. at 720 n.3 (quoting Allison by Fox v. Page, 545 N.W.2d 281, 283 (Iowa 1996) (emphasis added)). We noted “ ‘the general rule that one who has transferred ownership and control is no longer held liable.’ ” Id. at 721 (quoting Stalter by Stalter v. Iowa Res., Inc., 468 N.W.2d 796, 798 (Iowa 1991)).
This case is essentially the flip side of the control principle we have recognized in the foregoing cases. When Nikkei left the work site approximately a week before the *373 accident, the switchgear was locked up and in a safe condition. Little Sioux, not Nikkei, had exclusive access to and control over this equipment. Just as the contractor is typically in a better position to manage risks when it is in control, the employer is typically in a better position to manage risks when the contractor left the site a week ago and the employer is now in control. We believe the reasoning in Van Fossen leads inexorably to the district court’s finding of no duty in this case.[2] If one who has transferred ownership and control is no longer held liable, as in Van Essen, it follows logically that one who transferred control and never had ownership also should not be liable.
Application of the control principle makes sense here from a public policy perspective. Consider the implications of a contrary rule that a party has created a nondelegable risk of harm if the electricity is on when it leaves the premises. No matter that the accident occurred a week later, or that the facility could not operate without electricity, or that the owner was fully aware of the relevant risks, or that the equipment had been locked up. To avoid potential liability, various parties (owners, landlords, repairpersons, etc.) would need to turn off utilities that involve any risk of hazard (e.g., gas, electricity) whenever they leave a property. These unnecessary shutoffs would result in burdens and inconveniences to businesses and the general public.
Courts in other states have repeatedly found that in the absence of actual control, a property owner owes no duty to a contractor or a contractor’s employee who suffers injury from being electrocuted on the property owner’s premises. Merritt v. Bethlehem Steel Corp., 875 F.2d 603, 605-07 (7th Cir.1989) (rejecting the claim of a contractor’s employee that the premises owner had a duty to deenergize the lines where the contractor worked); Wells v. Gen. Elec. Co., 807 F.Supp. 1202, 1211 (D.Md.1992) (finding an employer owed no duty to a contractor’s employee in the absence of “latent or concealed dangers” or “actual physical control over the work area”); Jackson v. Petit Jean Elec. Co-op., 270 Ark. 506, 606 S.W.2d 66, 68 (1980) (finding a utility had no duty to deenergize its lines or warn an electrical contractor of “obvious hazards which are an integral part of the work the contractor was hired to perform”); Durbin v. Culberson Cnty., 132 S.W.3d 650, 660-61 (Tex.Ct.App.2004) (finding that the defendant owed no duty to a contractor who was electrocuted while changing out light bulbs on an energized pole, despite the contractor’s argument that the defendant should have provided locked down switches); cf. Groover v. Camp Dresser & McKee Inc., 420 Fed.Appx. 358, 362 (5th Cir.2011) (holding that a general contractor owed no duty to an employee of a subcontractor to warn of dangers of electrocution); Edick v. Paul de Lima Co., Inc., 6 A.D.3d 864, 775 N.Y.S.2d 385, 386 (2004) (holding a company that serviced a coffee maker owed no duty to an employee who received an electric shock while attempting to clean the coffee maker).
As we noted above, this case is basically the other side of the same coin. The undisputed facts are that Nikkei was hired as a subcontractor to do some work on the switchgears. When the project got to a certain point, Little Sioux decided it would *374 perform the next phase of the work itself instead of paying Nikkei to do it. So, Nikkei closed and secured the cabinets with penta-head bolts that could only be opened by a penta-head wrench in the possession of Little Sioux. In functional terms, Nikkei contracted the job back to Little Sioux, left the premises, and transferred control to Little Sioux. Like the district court, we do not see a material difference between “the employee of an independent contractor suing the owner, rather than an employee of the owner suing the independent contractor as in this case.” The duty principles are the same whether the employer turns the job over to the contractor who has actual control or the contractor turns the job back over to the employer who has actual control.[3]
The control rule persists under the Restatement (Third) of Torts, as we recognized in Van Fossen. Section 7(a) states, “An actor ordinarily has a duty to exercise reasonable care when the actor’s conduct creates a risk of physical harm.” Restatement (Third) of Torts § 7(a), at 77 (2010). But this is also subject to “an articulated countervailing principle or policy,” such as the control rule. Id. § 7(b); see also id. § 7 cmt. a, at 78 (stating that “[t]he principle or policy that is the basis for modifying or eliminating the ordinary duty of care contained in § 7(a) may be reflected in longstanding precedent”).[4] The reason is simple: The party in control of the work site is best positioned to take precautions to identify risks and take measures to improve safety.
This is entirely consistent with Iowa’s common law. Simply put, the cases involving parties that turn over control of premises to another party are “a category of cases” where “an articulated countervailing principle or policy” applies. See Thompson, 774 N.W.2d at 835.[5]
The court of appeals relied on Thompson v. Burke Engineering Sales Co., 252 Iowa 146, 106 N.W.2d 351 (1960), in finding that Nikkei owed a duty in this case. However, in Burke Engineering, the defendant installed a defective metal ceiling that later collapsed. 252 Iowa at 148, 106 N.W.2d at 352-53. The problem there was a defective product supplied by the defendant, where the defect was latent. Id. If McCormick had been injured because Nikkei performed defective work inside the switchgear cabinets, that might be a Burke Engineering-type case. But the problem here was not defective work, it was an inherent hazard associated with an instrumentality no longer under the defendant’s control.
The same observation applies to Kragel v. Wal-Mart Stores, Inc., 537 N.W.2d 699 (Iowa 1995). This too was a “bad work” case. A snow removal contractor did a poor job of removing wet snow from a *375 parking lot, leaving a layer of packed snow and ice behind. Kragel, 537 N.W.2d at 701-02. The plaintiff fell and sustained a fractured hip and a fractured elbow. Id. at 701. We held “[a] failed attempt to remove snow and ice can create an artificial condition subjecting the one who created the condition to liability.” Id. at 707. We emphasized “the evidence was that [the contractor] affirmatively altered the slushy snow.” Id. In any event, Kragel did not involve a transfer of control. See generally id.
A key distinction between Burke Engineering and Kragel, on the one hand, and this case, on the other, is that there was nothing wrong with the contractor’s (Nikkei’s) work. The only duty allegedly breached by Nikkei was a duty to warn. The duty to warn is especially susceptible to the control principle. When a party performs defective work, the negligence occurs at the time of performance, and the party that performed the work normally is in the best position to have prevented the accident; when the allegation is a failure to warn, though, that failure (like any “failure”) occurs over a period of time, and other parties may be in a better position to warn for multiple reasons. Therefore, we recognize various “no duty” rules in the warning area based on principles analogous to the lack of control. See, e.g., Restatement (Third) of Torts: Prods. Liab. § 5, at 130 (1998) (limiting the liability of raw material or component suppliers and requiring proof that the raw material or component was defective in itself); id. § 6(d) & cmt. e, at 145,148 (1998) (learned intermediary rule). For the foregoing reasons, we conclude that the control principle means Nikkei, the subcontractor, owed no general duty to McCormick, the employee of the property owner that had reassumed control of the equipment and the site.
Another way of looking at this case is to say that Nikkei did not create a “risk of physical harm” giving rise to a general duty under section 7(a) of the Third Restatement. See Porter v. Iowa Power & Light Co., 217 N.W.2d 221, 232 (Iowa 1974). There was nothing wrong with Nikkei’s work; any danger was the result of the inherent risks of active power lines. See id. at 233 (“We believe the presence near streets of electric transmission and distribution lines is a matter of common knowledge and a paving contractor can reasonably be expected to take precautions against contacting them.”). When Nikkei reenergized the line, it also locked up the switchgear. The danger arose only when Little Sioux used the penta-head wrench to gain access to the switchgear and allowed an untrained worker (McCormick) to work on it without first turning the power off.
B. “Assumed Duty.” Next, we turn to the question whether Konwinski’s affidavit changes the case. We believe it does not. Iowa and other jurisdictions recognize the concept of an “assumed duty.” See Wright v. Brooke Grp. Ltd., 652 N.W.2d 159, 177-78 (Iowa 2002); see also Restatement (Second) of Torts § 323, at 135 (1965). That is, a duty can be imposed on a defendant who “undertakes” to render a service to another. See Wright, 652 N.W.2d at 177-78 (holding that tobacco companies’ statements that they would report on the results of their research into the health effects of cigarettes were not an undertaking to warn customers of those effects). But Nikkei did not undertake to do anything here. At most, according to Konwinski’s affidavit, it failed to do what someone else asked it to do. See Wells, 807 F.Supp. at 1209 (finding that General Electric had assumed no duty to disconnect the electricity to panel boxes given the lack of competent evidence *376 that a GE employee had made affirmative comments that the boxes were dead).
C. Duty Under Restatement (Second) of Torts Section 384. Alternatively, McCormick relies in part on section 384 of the Restatement (Second) of Torts.
One who on behalf of the possessor of land erects a structure or creates any other condition on the land is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside of the land by the dangerous character of the structure or other condition while the work is in his charge.
Restatement (Second) of Torts § 384, at 289.
Nikkei contends it bears no liability under section 384 because section 384 only imposes liability on the subcontractor for dangerous conditions “while the work is in his charge.” We agree. Section 384 is not an exception to the control principle; it is an application of it. That section only extends the special duty of the contractor “while the work is in his charge.” Id. Two of the comments are particularly apt here:
[T]he work entrusted to the servant or contractor may be such that it necessarily creates a condition which is dangerous unless further steps are taken. In such a case the servant or contractor may be liable if he leaves the job in this dangerous condition, unless he has reason to expect that the necessary steps will be taken. The fact that his employer has retained charge of taking such steps or has entrusted them to another contractor is usually sufficient to warrant the servant or another contractor in assuming that they will be taken.
Id. § 384 cmt. e, at 290.
The rule stated in this Section applies to determine the liability of one who is entrusted by the possessor of land with the erection of a structure or the creation of any other physical condition on the land, for only such bodily harm as is caused while he remains in charge and control of the erection or creation of the structure or condition. It does not apply to determine his liability for harm caused after his charge and control of the work and his privilege to be upon the land for the purpose of accomplishing it is terminated in any manner. His charge and control is usually terminated by the possessor’s acceptance of the completed work, but it may be terminated in a variety of other ways. For example, the possessor may, in pursuance or in violation of his contract, take the work out of the hands of the independent contractor before it is completed or may order a servant to stop the work entrusted to him. Again, the possessor himself may be ejected from the land by one who has a paramount title thereto, or an injunction may prevent the continuance of the work.
Id. § 384 cmt. g, at 291-92.
Little Sioux had retained for itself the work required to prepare the brackets to receive the fault indicators, thus eliminating any special duty that might have been owed by Nikkei when it exercised control of the switchgears. Id. § 384 cmt. e, at 290. Even if the energized switchgears were deemed a dangerous condition, Nikkei owed no special duty under section 384 because it had “reason to expect” Little Sioux employees would follow mandatory company and OSHA regulations before accessing the locked cabinet. Id. And under comment g, Nikkei would owe no special duty to protect against harm caused after its “charge and control of the work and [its] privilege to be upon the land ... is terminated in any manner.” Id. § 384 cmt. g, at 291. Little Sioux instructed *377 Nikkei not to perform the work on the brackets, and Nikkei was unable to complete its work until the brackets were revised by Little Sioux. Accordingly, Nikkei’s control of the switchgears terminated until Little Sioux completed its work on the brackets. On this record, we conclude as a matter of law the work of repositioning the brackets was not in Nikkei’s charge, and Nikkei therefore owed no special legal duty to McCormick under section 384 at the time of his injury.
IV. Conclusion.
For the reasons stated, we affirm the judgment of the district court holding that Nikkei owed no duty to McCormick in this case.
COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.
CADY, C.J., and WATERMAN and ZAGER, JJ., join this opinion.
HECHT, J., files an opinion concurring in part and dissenting in part in which WIGGINS and APPEL, JJ., join.

. Because this case was resolved on a motion for summary judgment, we set forth the facts in the light most favorable to the nonmoving party, i.e., the plaintiff.

. The fact that a nonemployee spouse was the plaintiff in Van Fossen added another degree of remoteness to the claim. 777 N.W.2d at 692. But as the above quotations demonstrate, our reaffirmation of the “retained control standard” and our discussion of the duties of employers of independent contractors were stated in broad terms. The reasoning in Van Fossen applies here.

. Again, why should it make a difference whether the landowner turns over an energized line to a contractor or a contractor turns over an energized line to a landowner? See Merritt, 875 F.2d at 605-07; Wells, 807 F.Supp. at 1211; Jackson, 606 S.W.2d at 68; Durbin, 132 S.W.3d at 660-61. The control principle is the same.

. To put it another way, Nikkei did not create a "risk of physical harm” giving rise to a general duty under section 7(a) simply by energizing the line that it left locked securely to prevent unauthorized access. The risk arose only when Little Sioux used the pentahead wrench to gain access to the switchgear and allowed an untrained worker (McCormick) to work on it without first turning the power off.

.Of course, review of specific facts may be necessary to determine that there has been a complete transfer of control and that the claim does not involve defective work performed by the contractor. Nonetheless, we are still dealing with a "category of cases." Thompson, 774 N.W.2d at 835.