# IN THE COURT OF APPEALS OF IOWA

No. 15-0164
Filed November 12, 2015

**DINSDALE CONSTRUCTION, LLC,**
　　Plaintiff-Appellee,

**vs.**

**LUMBER SPECIALTIES, LTD.,**
　　Defendant-Appellant.

_____

　　Appeal from the Iowa District Court for Grundy County, Kellyann Lekar, Judge.

　　A defendant appeals following a jury verdict in a negligent misrepresentation case, asserting the district court should have granted the motion for a judgment notwithstanding the verdict. **AFFIRMED.**

　　Michael Carmoney and Allison J. Frederick of Carmoney Law Firm, P.L.L.C., Des Moines, for appellant.

　　Chad A. Swanson and Nathan J. Schroeder of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellee.

　　Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Lumber Specialties, Ltd., appeals the district court's denial of its posttrial motion for judgment notwithstanding the verdict after the jury found it to be at fault in a negligent misrepresentation case brought by Dinsdale Construction, L.L.C. Lumber Specialties asserts the case should be dismissed because, as a product manufacturer, it does not owe a duty of care to Dinsdale to supply information.[1] After considering the claims made on appeal, we affirm the district court's decision.

**I. Background Facts and Proceedings.**

Phelps Implement wanted to build a large combine repair shop addition to its farm implement dealership. It hired Moeller & Walter to manage and design the construction of the shop. Moeller & Walter contacted Dinsdale Construction, who agreed to supply the labor and the materials for building. Moeller & Walter contracted with Lumber Specialties to provide the roof trusses, headers and columns for the large garage-type openings, design engineering services, and an inspection when the building was complete. Moeller & Walter specifically chose Lumber Specialties because the company provided in-house engineering services through Steve Kennedy, the Lumber Specialties engineering intern—a service that would otherwise have to be contracted out to a different company.

---

[1] Lumber Specialties also claims the district court erred in its ruling denying the motion for judgment notwithstanding the verdict by giving preclusive effect to the denial of Lumber Specialties's motion for summary judgment. Because we conclude Lumber Specialties owed a duty to Dinsdale Construction as a matter of law, we need not address this claim.

The roof trusses were delivered with a generic installation guide that provided instructions on how to install the trusses and support them with temporary bracing. Lumber Specialties also provided a site specific engineering design for the permanent bracing for the roof. These plans were prepared by Lumber Specialties's employees and approved by Select Structural Engineering.

Dinsdale Construction erected the walls and began installing the roof trusses on June 26, 2012. After Dinsdale installed nineteen seventy-foot trusses, Lynn Trask of Moeller & Walter informed Kirk Dinsdale that he was going to contact Lumber Specialties to make sure the trusses had adequate temporary bracing. Trask sent an email to Ryan Callaway, the sales contact with Lumber Specialties, on June 28, stating,

> Ryan,
> I will be out of the office this afternoon. If you are in the area would you please stop by the Phelps job and look at what they have done. The 70' roof trusses were set on Tuesday. They feel they are braced well and stabilized to anchor the balance of the roof system. They did not set yesterday because of the wind.
> They are setting the 80' trusses today. If there is any bracing that they are missing please let Kirk or I know so we can address ASAP.
> Thanks, Lynn

Ryan went out to the job site and looked around for a few minutes. Kirk noticed Ryan walking around the job site while Kirk was on the roof with his crew. Ryan explained to Kirk that Lynn had asked him to check out the bracing. Ryan went on to say, "Everything looks great. Keep doing what you are doing." The next day, Friday, June 29, Ryan emailed Lynn:

> Lynn—
> I stopped by the Phelps site yesterday. They were still installing purlins and bracing on the trusses that they had set.

Steve Kennedy will be doing the final inspection on the building which will include inspecting the bracing. If needed, recommendations will be made at that time. Please give Steve at least three day lead time to schedule the final inspection on the building. Thank you.

Lynn wrote back a few hours later:

Thanks Ryan,
I am aware Steve will be doing the inspection when done. Just thought it would be good to have you stop and check progress see if there are any obvious things that you see that could create more stability during the set stage. Thanks for stopping. Let me know if you have any suggestions or saw anything that I need to be aware of.
Thanks, Lynn

Ryan responded, "Lynn—Nothing 'jumped' out at me that needed more temporary bracing. I thought everything looked good on what they had completed." Lynn then replied, "That's what I was really asking for. I have a lot of confidence in your expertise and opinion."

The following week, Kirk continued setting the rest of the trusses consisting of forty, eighty-foot trusses over the span of the building. Kirk and his crew also installed all the permanent bracing and began working on the purlins. At the end of the day on Friday, July 6, Kirk noticed some of the trusses on the north half of the building began to bow. Kirk used his lift with a telescoping boom to attempt to stabilize the trusses over the weekend until his crew could return to fix the problem the following Monday. He checked on the building on Saturday and noticed the bowing had gotten worse. With the help of his son, Kirk used another of his lifts to put tension on the trusses to stabilize it until his crew could return. He visited the site again on Sunday morning July 8, and based on the look of the trusses, he knew the building was going to collapse. He contacted

the manager of Phelps Implement and Lynn with Moeller & Walter. As Kirk was going to attempt to get his lifts out of the building, a Phelps Implement employee drove onto the lot. Kirk got ten feet out of the building to speak with the employee, and the building collapsed.

Kirk again contacted Lynn and the manager of Phelps Implement to notify them of the collapse and stayed on site until others arrived, including Ryan Callaway. The scene was left undisturbed for a few days while engineers attempted to determine the cause of the collapse. It was ultimately decided the collapse was due to inadequate temporary bracing of the roof trusses.

Both Kirk and Lynn testified Steve Kennedy stated during the postcollapse inspection that the employees of Lumber Specialties would have known and understood the guidelines with respect to temporary bracing. Steve denied making any such statement and testified it would not have been reasonable for Kirk and Lynn to rely on Ryan's advice on temporary bracing in light of the fact that Ryan was a sales person, not an engineer.

Ryan confirmed in his trial testimony he sent those emails to Lynn and told Kirk to keep doing what he had been doing during his courtesy site visit. He explained he felt comfortable going to the site and reviewing the bracing that had been erected. He further testified that Kirk and Lynn should have been able to rely on the review and advice he gave in June regarding the temporary bracing for the trusses that had been installed at that time.

The jury returned a verdict against Lumber Specialties for negligent misrepresentation, assigning 64% of the fault to Lumber Specialties and 36% of

the fault to Dinsdale Construction. Lumber Specialties appeals, maintaining the court erred in denying its motion for judgment notwithstanding the verdict because it did not owe a duty to Dinsdale Construction.

## II. Scope and Standard of Review.

We review a court's denial of a motion for judgment notwithstanding the verdict for correction of errors at law. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). We ask only whether a fact question was generated after viewing the evidence in the light most favorable to the nonmoving party. *Id.* The issue in this case is whether Lumber Specialties owed a duty to Dinsdale Construction. Whether a legal duty exists is a question of law for the court to decide. *McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 371 (Iowa 2012). Normally, the existence of a duty focuses on the relationship between the parties and public policy. *Id.*

## III. Negligent Misrepresentation.

Dinsdale Construction sued Lumber Specialties asserting Lumber Specialties's employee, Ryan Callaway, negligently misrepresented the adequacy of the temporary bracing supporting the roof trusses. Negligent misrepresentation is defined as:

> "(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012) (quoting Restatement (Second) of Torts § 552 (1977)). When a negligent misrepresentation results in personal injury or property damage, the claim is treated like any other negligence claim. *Id*. at 110. However, "when misrepresentation based on negligent acts results solely in an interference with intangible economic interests, more restrictive rules of recovery have been developed" because of "the fear that liability for misinformation could be virtually unlimited and include unknown claimants under the traditional foreseeability limitation applicable to negligence claims." *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 123 (Iowa 2001). In such a case, we restrict who can be liable to "only those who are 'in the business of supplying information to others.'" *Pitts*, 818 N.W.2d at 111 (citation omitted).

> This narrowing of the universe of potential defendants liable for negligent misrepresentations promotes fairness by ensuring that those liable are only those who supply information in an advisory capacity and are "manifestly aware" of how the information will be used and "intend[ ] to supply it for that purpose." The restriction also ensures that those liable are "in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect."

*Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 691 (Iowa 2010) (alteration in original) (citations omitted).

The factors we consider in determining whether a person is "in the business of supplying information" include: (1) whether the relationship between the parties is at arm's-length and adversarial or advisory; (2) whether the person providing the information is "manifestly aware of the use that information will be put and intends to supply it for that purpose"; (3) whether the information is given

"gratuitously or incidental to a different service"; and (4) what role the defendant was playing when the misrepresentation occurred. *Pitts*, 818 N.W.2d at 111–12. Our courts have found "accountants, appraisers, school guidance counselors, and investment brokers all fall within this class of potential defendants." *Id.* at 112.

> However, we have refused to allow a suit for negligent misrepresentation where the defendant was a retailer in the business of selling and servicing merchandise, a seller who made misrepresentations pursuant to the sale of a business, a bank officer negotiating a loan guarantee with a bank customer, or an employer negotiating with an employee for employment.

*Id.*

Lumber Specialties asserts it did not owe a duty to Dinsdale Construction under a negligent misrepresentation claim because Lumber Specialties is not in the business of supplying information.[2] It claims the advice Ryan Callaway offered regarding the temporary bracing was incidental to, or gratuitously provided as part of, the sale of its product—roof trusses. Dinsdale Construction asserts Lumber Specialties owed it a duty in light of the fact that it did not just supply a product—the trusses—but also provided information—engineering services.

To determine whether Lumber Specialties was in the business of supplying information, so as to subject it to a duty to provide accurate information, we consider the following factors outlined in *Pitts*, 818 N.W.2d at 111–12:

---

[2] Neither party asserts the negligent misrepresentation claim resulted in property damage in this case; thus, we proceed to address whether Lumber Specialties is in the business of supplying information.

*1. Whether the relationship between the parties is at arm's-length and adversarial or advisory.* Lumber Specialties sold the trusses and engineering services to Moeller & Walter. Moeller & Walter then sold the trusses to Dinsdale Construction to use in the project, which ultimately billed Phelps Implement for the building. Lumber Specialties had no direct relationship with Dinsdale Construction by virtue of the construction contract or any other arrangement. Commercial transactions over goods and services are typically considered arms-length transactions and are not advisory. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 227 (Iowa 1998) ("We refuse however to apply this rule to a retailer in the business of selling and servicing its goods."); *Meier v. Alfa-Laval, Inc.*, 454 N.W.2d 576, 581 (Iowa 1990) (concluding the tort of negligent misrepresentation will not apply to a retailer who later services his merchandise because the law of contract and warranty provide more appropriate remedies for misstatements during the sale and servicing of a product). However, there was not a traditional arm's-length transaction between Dinsdale Construction and Lumber Specialties in this case as Dinsdale Construction did not negotiate and purchase the roof trusses or engineering services directly from Lumber Specialties.

Kirk met with Steve Kennedy from Lumber Specialties before construction began for a prebuild meeting where they discussed the permanent bracing that would be used to support the trusses. Lumber Specialties, in conjunction with Select Structural Engineering, had prepared a site specific "roof framing and permanent web bracing" plan. Steve walked Kirk through the steps involved in

applying the permanent bracing for the structure. This was not a negotiation over the sale of the product but was advice given on how to use or install the product as a component part of the building.

When questions developed regarding the temporary bracing during construction, Lynn contacted Ryan to provide an opinion on the temporary bracing during the construction. Kirk had not previously met Ryan before the day Ryan provided his advice regarding the temporary bracing. But the sale by Lumber Specialties to Moeller & Walter was complete, and Ryan considered the visit to be a courtesy call to maintain a good relationship with his customer— Moeller & Walter. *See Pitts*, 818 N.W.2d at 112–13 (noting it is important to analyze the parties' relationship when the misrepresentation took place not when relationship first began). We conclude that at the time when the misrepresentation took place, the relationship between the parties was not at arm's length and adversarial, but was advisory.

*2. Whether the person providing the information is manifestly aware of the use that information will be put and intends to supply it for that purpose.* In this case, Ryan was specifically asked by Lynn to provide information regarding the adequacy of the temporary bracing on the roof trusses being installed. If Ryan was not competent to give an opinion on the adequacy of the bracing in light of his status as a sale person with Lumber Specialties, Ryan could have refused to give the advice or requested a consultation with someone more qualified, such as Steve Kennedy. The information provided by Ryan was meant for Dinsdale Construction's benefit, and Ryan knew the information would be used by

Dinsdale Construction. We conclude Ryan was manifestly aware of the reason for the request for information, i.e., to support the structure during construction, and intended to supply the information to the two people he knew needed the information to complete the project. *See Larson v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 286–87 (Iowa 1981) (noting the bank owed duty to the home buyer under a theory of negligent misrepresentation when the appraisal the bank prepared failed to disclose critical defects in the home to be purchased).

*3. Whether the information is given gratuitously or incidental to a different service.* The information provided here was occasioned by the sale of the roof trusses by Lumber Specialties to Moeller & Walter. Manufacturers and sellers are not normally considered to be in the business of supplying information when they make, sell, or service their products. *See Greatbatch v. Metro. Fed. Bank*, 534 N.W.2d 115, 117 (Iowa Ct. App. 1995) ("On one hand, manufacturers and dealers of merchandise have not generally been considered to be in the business of supplying information. Their businesses involve making, selling and servicing products, and any information provided during the course of the business is incidental."); *Meier*, 454 N.W.2d at 581 (concluding the tort of negligent misrepresentation will not apply to a retailer because the opinion regarding the fitness of the product was rendered when the retailer was employed to service or repair the product).

However, the information provided was not given as part of the negotiated sale of the roof trusses. Ryan testified he considered the visit to be a courtesy to his customer and was not a part of the contract. The structural inspection that

was part of the contract was to be done when the building construction was final and was focused on the permanent bracing. Ryan was not acting to sell products when he made the site visit but was arguably seeking to keep a customer happy so as to secure future sales. *See Nationwide Agribusiness v. Structural Restoration, Inc.*, 705 F. Supp. 2d 1070, 1080–81 (N.D. Iowa 2010) (noting the inspection in question was not incidental to any arm's length transaction between the parties but it also was not given gratuitously because the defendant viewed it as a "sales tool" having an indirect financial benefit for the company to obtain future work).

*4. What role the defendant was playing when the misrepresentation occurred.* Lynn knew Ryan was a sales person for Lumber Specialties but asked him to specifically render an opinion as to the adequacy of the temporary bracing. Lynn stated he had "a lot of confidence in [Ryan's] expertise and opinion." Both Lynn and Kirk testified regarding Steve Kennedy's statement at the postcollapse investigation that all employees of Lumber Specialties are aware of how bracing needs to be done on buildings and they understand the temporary bracing guidelines. Ryan testified he was comfortable reviewing the bracing and confirmed Kirk and Lynn should have been able to rely on the advice he gave regarding the temporary bracing.

While neither the contract nor Ryan's job description placed a duty on Ryan to render an opinion as to the temporary bracing, Ryan voluntarily agreed to visit the construction site and give his opinion as to the adequacy of the temporary bracing.

> One who undertakes to do an act or perform a service for another has the duty to exercise care, and is liable for injury resulting from his failure to do so, even though his undertaking was purely voluntary or gratuitous, and he was not under any obligation to do such act or perform such service, or there was no consideration for the promise or undertaking sufficient to support an action ex contractu based thereon.

*McCrady v. Sino*, 118 N.W. 592, 597 (Iowa 1962); *see also* 65 C.J.S. *Negligence* § 40 (2010) ("A volunteer can be liable for injury resulting from his or her failure to use reasonable care even though the undertaking was a purely voluntary undertaking or even though it was completely gratuitous, and he or she was not under any obligation to do such act or perform such service."). Ryan, as an agent of Lumber Specialties, voluntarily agreed to come to the site, observed the temporary bracing, and provided an opinion as to the adequacy of that bracing. *See Jane Doe 3 ex rel v. White*, 951 N.E.2d 216, 228–29 (Ill. App. Ct. 2011) (concluding an employer could be liable under theory of negligent misrepresentation where the employer voluntarily undertook duty to supply an employment reference); *Singer v. Beach Trading Co.*, 876 A.2d 885, 892 (N.J. Sup. Ct. App. Div. 2005) (same).

We conclude based on our consideration of the four factors, when Lumber Specialties gave advice to Dinsdale Construction about the installation of its product, it was in the business of supplying information such that it owed a duty to exercise care in giving that advice to Dinsdale Construction. Through its agent, Ryan Callaway, Lumber Specialties voluntarily offered the advice about the adequacy of the temporary bracing in response to a specific inquiry from Lynn. There was no traditional arm's-length transaction between Dinsdale

Construction and Lumber Specialties as Dinsdale Construction never negotiated directly with Lumber Specialties for any products or services. The contract at issue, between Lumber Specialties and Moeller & Walter, involved both the purchase of a product—roof trusses—and also the purchase of information—engineering services. After the purchase, Lumber Specialties employee, Steven Kennedy, provided advice and information regarding the steps involved in applying the permanent bracing for the structure. In addition, the advice in question was given by someone (Ryan) who was aware of the reason for the request and intended to supply the information for an expressed purpose, and the advice was not given gratuitously.

Lumber Specialties was "manifestly aware" of how the information would be used and intended to "supply it for that purpose." *Van Sickle Constr.*, 783 N.W.2d at 691. Lumber Specialties was in a unique position as the supplier of both the product and the information of how to install the product "to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect." *Id.* We are not concerned under the facts of this case that liability for misinformation "could be virtually unlimited and include unknown claimants under the traditional foreseeability limitation applicable to negligence claims." *See Sain*, 626 N.W.2d at 123. The claimant, Dinsdale Construction, was known to Lumber Specialties; Dinsdale Construction and Moeller & Walter specifically requested the information; and the consequences of misinformation were well known to all parties—building collapse.

Therefore, under the unique facts of this case, we conclude that when Lumber Specialties agreed to and did provide an opinion to Dinsdale Construction regarding the temporary bracing of the roof trusses, it owed a duty to provide accurate information. The district court properly denied the motion for judgment notwithstanding the verdict, and the jury was entitled to determine whether that duty was breached.[3]

**AFFIRMED.**

Danilson, C.J., concurs; McDonald, J., dissents.

---

[3] Dinsdale Construction seeks an award of appellate attorney fees and expenses. "[A]n award of attorney fees is not allowed unless authorized by statute or contract." *W.P. Barber Lumber Co. v. Celania*, 674 N.W.2d 62, 66 (Iowa 2003). Dinsdale cites no authority to support such an award in this case. The request is therefore denied.

**MCDONALD, Judge.** (dissenting)

I respectfully dissent. Under Iowa law, a claim for negligent misrepresentation lies only where the person who supplies the information owes a duty to the person to whom the information is provided. *See Sain*, 626 N.W.2d at 124. The Iowa Supreme Court has "narrowed the scope of the tort to claims stated against those in the business of supplying information to others." *Van Sickle*, 783 N.W.2d at 691 (internal quotation marks omitted). "Without facts to show a person is in the business of supplying information to others, no duty arises." *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 492 (Iowa 2000). Thus, it is immaterial whether Lumber Specialists's employee provided information incidental to the sale of Lumber Specialists's trusses. The undisputed material fact remains—Lumber Specialists is a product manufacturer and not in "the business of supplying information to others." It thus owed no duty to Dinsdale and is entitled to judgment as a matter of law. *See Meier*, 454 N.W.2d at 581 (holding claim for negligent misrepresentation did not lie against manufacturer and dealer of milking equipment); *see also Amana Soc. Inc. v. GHD, Inc.*, No. 10_CV-168-LRR, 2011 WL 3515475, at *5 (N.D. Iowa Aug. 11, 2011) (holding company designing anaerobic digester was not in business of supplying information as a matter of law even where it made multiple representations regarding the design and operation of the product sold); *The Conveyor Co. v. Sunsource Tech. Servs. Inc.*, 398 F. Supp. 2d 992, 1015 (N.D. Iowa 2005) (holding seller of hydraulic equipment was not in the business of supplying information where it provided information incidental to sale of

equipment and noting the "the pecuniary interest in its business of selling hydraulic lift packages simply does not create the sort of duty that would sustain a negligent misrepresentation claim"); *Employers Mut. Cas. Co. v. Collins & Aikman Floor Coverings, Inc.*, No. 4:02-CV-30467, 2004 WL 840561, at *22 (S.D. Iowa Feb. 13, 2004) (stating "[m]anufacturers are generally not considered to be in the business of supplying information" and holding manufacturer and seller of commercial carpet was not subject to claim of negligent misrepresentation); *Fox Assocs., Inc. v. Robert Half Int'l, Inc.*, 777 N.E.2d 603, 607-08 (Ill. Ct. App. 2002) (collecting cases and stating negligent misrepresentation generally does not apply to "manufacturers and sellers of tangible goods such as computers and construction materials"); *Wachs Tech. Servs., Ltd. v Praxair Distr., Inc.*, No. COA11-633, 2012 WL 945215, at *5 (N.C. Ct. App. Mar. 20, 2012) (holding manufacturer of welding materials was not in the business of supplying information).